George E. DUDLEY, Receiver for Insurance Investors Trust Company, Plaintiff-Appellant,

v.

SOUTHEASTERN FACTOR AND FINANCE CORPORATION et al., Defendants-Appellees.

No. 30641.

United States Court of Appeals, Fifth Circuit.

July 9, 1971.

Certiorari Denied Oct. 12, 1971. See 92 S.Ct. 109.

Richard L. Parker, Charles D. Read, Jr., Atlanta, Ga., John E. Boyce, Stuart A. Handmaker, Louisville, Ky., for plaintiff-appellant; Handmaker, Weber & Meyer, Louisville, Ky., Grizzard, Jones, Parker & Simons, Atlanta, Ga., of counsel.

E. Lewis Hansen, Martin H. Rubin, Gerald A. Friedlander, Frank B. Hester, Joseph R. Manning, Richard M. Hester, Hester & Hester, Atlanta, Ga., Daniel P. Matthews, Atlanta, Ga., Ivan A. Ezrine, New York City, Richard T. Bridges, Thomaston, Ga., for defendants-appellees.

Bruce W. Skinner, pro se.

Before WISDOM, Circuit Judge, DAVIS *, Judge, and GOLDBERG, Circuit Judge.

DAVIS, Judge:

This is another case staking out a piece of the already crowded field of "sellers" and "purchasers" of securities under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1964) and its enabling rule, Rule 10b-5, 17 C.F.R. § 240.10b-5 (1971). We are called upon to determine whether appellant George Dudley, acting as representative of Insurance Investors Trust Company (IITC), has such standing on the basis of the assertions in his complaint. He was appointed receiver of IITC (a Kentucky corporation) in 1967 and discovered among its assets a certificate of ownership of shares of the preferred stock of Southeastern Factor and Finance Corporation (SEFAF), incorporated in Georgia. Authorized by the court which appointed him to assert and enforce all of IITC's claims, appellant brought this action in the Northern District of Georgia against SEFAF, certain of its principals, its shareholders as a class, and other corporations, alleging that through a liquidation of SEFAF in which IITC was not allowed to participate, IITC was defrauded of its investment in SEFAF, contrary to § 10(b) and Rule 10b-5 (and also of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q (1964)). The suit sought damages from the wrongdoers, or in the alternative equitable relief to allow IITC to recover the value of stock distributions from the persons to whom they were made since, in IITC's view, those distributions should have gone to it. The District Court, 315 F.Supp. 1019, dismissed the action on the ground that the complaint did not show that IITC was a "seller" or "purchaser" of securities within the coverage of the statute and the rule, and the appeal is from that judgment.

Since the case is before us on a motion to dismiss, we must, of course, take as true all the factual allegations of the complaint, supplemented by its exhibits. Coffee v. Permian Corp., 434 F.2d 383, 384 (C.A.5, 1970); Kahan v. Rosenstiel, 424 F.2d 161, 164 (C.A.3), cert. denied sub nom. Glen Alden Corp. v. Kahan, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963, 965 (C.A.2, 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970). These show that in July 1966 IITC transferred to SEFAF 690,996 shares of the stock of Acme, Inc., in return for which SEFAF issued 167,624 shares of its own preferred stock to IITC. Some 39,000 of these SEFAF shares were later disposed of by IITC, leaving it with at least 128,158 shares.[1] In June 1967 SEFAF entered into an agreement with Atlantic Services, Inc. (Atlantic) under which SEFAF conveyed virtually all its assets to Atlantic in return for some 32,500 shares of preferred stock, and some 175,000 common shares, of Atlantic. It is then asserted that these Atlantic shares were distributed, under a plan to liqui-

* Honorable Oscar H. Davis, U. S. Court of Claims, sitting by designation.

1. The complaint states that appellant "has reason to believe that * * * IITC has rights of ownership in shares of stock of Southeastern [SEFAF] in addition to that represented" by the certificate for the 128,158 shares.

date SEFAF, to SEFAF's creditors and to its shareholders, except for IITC which did not receive any distribution. These transactions between SEFAF and Atlantic are said to have occurred without IITC's knowledge or consent, in fraud of its rights, and through use of the mails and instrumentalities of interstate commerce. The result, in appellant's view, was to leave IITC with stock in a corporation which lacks operative existence.[2]

The two texts which frame our answer to the query whether these allegations are enough to invoke federal jurisdiction (under the securities legislation) provide:

Section 10(b) of the Securities Exchange Act of 1934:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> \* \* \* \* \* \*
>
> (b) To use or employ, *in connection with the purchase or sale of any security* registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1964) (emphasis added).

Rule 10b–5 of the Securities and Exchange Commission:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) to employ any device, scheme or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> *in connection with the purchase or sale of any security.*" 17 C.F.R. § 240.10b–5 (1971) (emphasis added).

The leading case of Birnbaum v. Newport Steel Corporation, 193 F.2d 461 (C.A.2), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), interpreted the italicized phrase in both statute and rule as limiting permissible plaintiffs in a civil action under the rule to "purchasers" or "sellers" of securities. While this reading may not have been inherent in the literal language, *cf.* Mutual Shares Corporation v. Genesco, Inc., 384 F.2d 540, 543–544 (C.A.2, 1967), and despite some academic criticism, *see, e. g.* Leech, Transactions in Corporate Control, 104 U.Pa.L.Rev. 725, 832–35 (1956); Comment, 100 U.Pa.L.Rev. 1251 (1952), and even a judicial prediction of *Birnbaum's* demise, Entel v. Allen, 270 F.Supp. 60, 70 (S.D.N.Y.1970), that holding remains, as Judge Wisdom put it, "[b]loody but unbowed" within its circuit. Rekant v. Desser, 425 F.2d 872, 877 (C.A.5, 1970). See Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963 (C.A.2, 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Greenstein v. Paul, 400 F. 2d 580, 581 (C.A.2, 1968). In a trilogy of recent cases,[3] this court (through the pen of Judge Ainsworth) thoroughly

---

2. Appellant's brief asserts that SEFAF currently "has no assets, no liabilities, no common shareholders, no directors, no officers, and essentially no existence." An affidavit filed by appellant in the court below declares that "he believes [SEFAF] has no remaining asset of any value to distribute in liquidation."

3. Herpich v. Wallace, 430 F.2d 792 (C.A. 5, 1970); Herpich v. Wilder, 430 F.2d 818 (C.A. 5, 1970); Shell v. Hensley, 430 F.2d 819 (C.A. 5, 1970).

considered the "purchaser"/"seller" requirement, and adopted the *Birnbaum* rule for this region, saying that "for a plaintiff to establish his standing to maintain a Rule 10b–5 action for damages, he must be a purchaser or seller of the securities involved in connection with the alleged rule violation." Herpich v. Wallace, *supra*, 430 F.2d 792, 806 (C.A.5, 1970).

But it has also been pointed out, many times, that the purchaser-seller requirement does not demand a sale in "the strict common law traditional sense," Hooper v. Mountain States Securities Corporation, 282 F.2d 195, 203 (C.A.5, 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Herpich v. Wallace, *supra*, 430 F.2d 792, 806 (1970); and *Birnbaum's* progeny have for the most part interpreted those terms very liberally.[4] For example, in Ruckle v. Roto American Corporation, 339 F.2d 24 (C.A.2, 1964), a company caused by its control group to issue treasury shares at prices arbitrarily established was held to be a seller within the rule. *See* Schoenbaum v. Firstbrook, 405 F.2d 215, 219 (C.A.2, 1968) (en banc), cert. denied sub nom. Manley v. Schoenbaum, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). In A. T. Brod & Co. v. Perlow, 375 F.2d 393 (C.A.2, 1967), a stockbroker whose customer ordered stock, but refused to pay for it if its market price had not increased by the payment date, was held to have standing as a purchaser; the court said that "[n]ovel or atypical methods should not provide immunity from the securities laws." 375 F.2d at 397. In Dasho v. Susquehanna Corporation, 380 F.2d 262 (C.A.7), cert. denied sub nom. Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967), Susquehanna Corporation agreed to merge the American Gypsum Company

into it by issuing shares to Gypsum's stockholders pursuant to a prescribed exchange ratio. The Seventh Circuit held that Susquehanna's exchange of its shares for Gypsum's assets in order to merge the two companies was a sale of securities, and Susquehanna had standing to assert a violation of the rule. *See also* Herpich v. Wallace, *supra*, 430 F.2d 792, 809 (C.A.5, 1970); Erling v. Powell, 429 F.2d 795, 798 (C.A.8, 1970); Crane Company v. Westinghouse Air Brake Company, 419 F.2d 787, 797–798 (C.A.2, 1969); cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Mader v. Armel, 402 F.2d 158, 160–161 (C.A.6, 1968), cert. denied sub nom. Young v. Mader, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969); Hooper v. Mountain States Securities Corp., *supra*, 282 F.2d 195, 202–203 (C.A.5, 1960).

Applying this general canon of broad construction is a line of 10b–5 decisions which is particularly close, in facts and rationale, to our case. In Vine v. Beneficial Finance Company, 374 F.2d 627 (C.A.2), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), the plaintiff was a shareholder of a corporation, Crown Finance Company, most of whose stock had been acquired by Beneficial Finance Company which, under state law, could effect a so-called short-form merger without the approval of the class of shareholders of which plaintiff was a member. Although the plaintiff had retained his shares in Crown Finance, his only remaining right was either to sell his stock for Beneficial's cash offer or to pursue his appraisal rights, which woud also result in a cash payment for his shares. The opinion noted that "[s]ince, in order to realize any value for his stock, appellant must exchange the shares for money from appellee, as a practical matter appellant

4. The Securities Exchange Act encourages such liberal construction by providing:

"The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.

The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U.S.C. § 78c(a) (13), (14) (1964).

*See* Fidelis Corporation v. Litton Industries, Inc., 293 F.Supp. 164, 169–170 (S.D.N.Y.1968).

must eventually become a party to a 'sale,' as that term has always been used." 374 F.2d at 634. In these circumstances the Second Circuit held the plaintiff a forced seller, with standing under the rule. 374 F.2d at 635.

This "forced sale" rationale was applied to a tender-offer situation in Crane Company v. Westinghouse Air Brake Company, *supra*, 419 F.2d 787 (C.A.2, 1969). Crane proposed a merger with Westinghouse which it sought to accomplish through a tender offer to Westinghouse's shareholders, under which the former acquired substantial amounts of the latter's stock. Westinghouse's management decided, however, that American Standard, Inc. was a more companionable suitor, and through a series of market manipulations (it was alleged) the Crane proposal was defeated by vote of the stockholders, allowing Westinghouse to be merged into American Standard. Shares of American Standard were then distributed to Westinghouse stockholders, including Crane, which American Standard threatened with a divestiture action under the anti-trust laws unless Crane sold its holdings. Crane began selling its American Standard stock and brought suit. The court held that Crane had standing, at least as a forced seller of the shares it owned at the time of trial, to assert American Standard's violations of Rule 10b–5.

*Vine's* informing principle, carried forward in *Crane*, is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares. *See* Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965). That rationale has recently been applied by this court to a liquidation in a case that in our view is indistinguishable from the one before us. In Coffee v. Permian Corporation, *supra*, 434 F.2d 383 (1970), a minority stockholder (Coffee) sued under § 10(b) and Rule 10b–5, alleging that his corporation had been substantially liquidated solely for the benefit of its 80 per cent corporate stockholder (Permian). Coffee's complaint was that, after he had purchased shares in the Knight Company, it issued shares to Permian, making the latter a 50 per cent owner. Permian later gained control of Knight's board of directors and, after achieving 80 per cent ownership, caused Knight to adopt a plan of liquidation under which its assets would be appropriated solely for Permian's benefit. The District Court dismissed the complaint for the reason that Coffee was not a seller or purchaser. This court reversed, holding that Coffee was a seller and suggesting that he might be a purchaser as well. The opinion found the *Vine* reasoning applicable, and noted that *Vine* turns "on whether the shareholders, * * * have in substance become sellers despite the fact that they still hold stock certificates in a non-functioning corporation," and that "[i]n both instances [*Vine* and *Coffee*] the shareholder 'as a practical matter' has no choice but to surrender his interest in the corporation and to exchange his shares for cash." 434 F.2d at 386. The court explicitly extended the *Vine* principle from a merger to a liquidation. 434 F.2d at 386.

We think that here, too, the asserted liquidation of SEFAF constituted in effect a sale of IITC's shares in it. Appellant charges in substance (and appellees do not yet deny) that the plan of dissolution and liquidation adopted by SEFAF's board of directors had two steps. First, SEFAF's only substantive asset, its stock in First American Life Insurance Company (an Alabama corporation), was to be traded to Atlantic for Atlantic shares which in turn were to be distributed directly to SEFAF's shareholders and creditors as an "initial" liquidating dividend. The second step was to be a "final" liquidating dividend of cash from the proceeds, if any, of certain litigation in which SEFAF is plaintiff. The "initial" liquidating dividend has been distributed to SEFAF's

shareholders and creditors, but IITC did not share in it. Some of the appellees suggest that SEFAF's liquidation is still in process and that IITC will ultimately participate in the "final" dividend from the litigation proceeds. We do not think that this contingency of a possible monetary payment impairs IITC's status as a seller under the statute and the rule. The litigation was filed in 1967 and no proceeds have yet been forthcoming; appellant asserts that the likelihood is that none ever will. See note 2, *supra*. In any event, even assuming that there may ultimately be a "final" dividend of money, the assertion is that SEFAF has already been substantially liquidated and is a non-functioning corporation within the principle of *Vine* and *Coffee;* IITC's investment in a going enterprise has been commuted into a right (said to be a remote and speculative one at that) to a payment of money. We hold therefore, following *Vine* and *Coffee*, that IITC is a seller under § 10(b) and Rule 10b-5. *See also* Fidelis Corporation v. Litton Industries, Inc., 293 F.Supp. 164, 168-170 (S.D.N.Y.1968).[5]

We agree, it goes without saying, that merely because conduct is reprehensible does not make it redressable under the federal securities laws. Herpich v. Wallace, *supra*, 430 F.2d 792, 808. As in *Coffee*, 434 F.2d at 386, it may be that the fact-finder will eventually determine that IITC was not a "seller", either because SEFAF was not substantially liquidated or for some other reason. "However, at this point in the litigation we are confined to evaluating [appellant's] allegations, and they charge that [SEFAF] has been substantially liquidated pursuant to [SEFAF's and Atlantic's] plan. If that is true, then [IITC's] stock has been converted into a claim for cash", and appellant "would have standing as a seller to sue under § 10(b) of the Securities Exchange Act and Rule 10b-5." 434 F.2d at 386. The essence of the case is that appellant has alleged enough to be given an opportunity to prove that the provisions of statute and rule have been infringed.[6] We cannot now say that plaintiff will be unable to demonstrate any set of facts, in support of his claim, entitling him to relief.

---

5. We need not decide whether IITC is likewise a "purchaser" within either § 10(b) of the 1934 Act and Rule 10b-5, or within § 17(a) of the 1933 Act. Nor do we consider appellant's secondary proposition that, since it alternatively seeks equitable relief, it need not for that purpose be a "purchaser" or "seller" to have standing under Rule 10b-5. *See* Mutual Shares Corp. v. Genesco, Inc., *supra*, 384 F.2d 540, 546-547 (C.A. 2, 1967).

6. While the complaint would hardly rate an "A" for precise drafting, it does allege (among other things) :

"The exchange between Atlantic and Southeastern was pursuant to a plan of liquidation adopted by Southeastern, whereby all creditors and shareholders were to receive assets of Southeastern.

"At all times from and after June 1, 1967, Atlantic knew or should have known of, the existence of the issued and outstanding preferred stock of Southeastern held and owned by IITC and First American.

"Defendant, Atlantic, distributed all of the shares of its convertible preferred

stock issued pursuant to its obligations under the agreement * * * directly to the creditors and common shareholders of Southeastern, ignoring the preferred stock position of IITC and First American.

\*　　\*　　\*　　\*　　\*

"IITC has received no Atlantic stock nor has it received any money or other assets in any liquidation of Southeastern."

The complaint also declares that, in the exchange between SEFAF and Atlantic, appellees "by use of means or instrumentalities of interstate commerce, or of the mails, conspired to employ devices, schemes, or artifices to defraud IITC and its stockholders; and to engage in acts, practices, or courses of business which operated as a fraud or deceit upon IITC and its shareholders." These assertions, taken together, fairly apprise the appellees of the transactions complained of, and satisfy F.R.Civ.Proc. 9(b) which requires particularity in allegations of fraud. *See* Nolan Bros., Inc. v. United States, 266 F.2d 143, 145-146 (C.A. 10, 1959).

Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957).

The order dismissing the complaint is reversed, and the action is remanded for further proceedings in accordance with this opinion.[7]

Reversed and remanded.

7. After the motion to dismiss was granted, appellant sought leave to amend his complaint to show diversity of citizenship, which leave was denied by the District Court. Appellant appeals also from that denial. Since we hold that he can assert

his claims under the Securities Exchange Act, we do not reach the diversity issue.