**Graham C. GARNER et al.,
Plaintiffs,**

v.

**Tazwell W. PEARSON et al.,
Defendants.**

**No. 72-416 Civ. T-K.**

United States District Court,
M. D. Florida,
Tampa Division.

April 5, 1974.

## MEMORANDUM OPINION AND ORDER

KRENTZMAN, District Judge.

The jurisdictional posture of this case is convoluted at best. Various motions to dismiss the second amended complaint came on for hearing on May 25, 1973. At that hearing, defendants questioned the complete diversity of parties in this action by contending that defendant Robert Bussey was in fact a stateless citizen of the United States. *See* Memorandum Opinion and Order of June 14, 1973. An evidentiary hearing on defendant Bussey's citizenship was held on September 6, 1973. After said hearing, at which plaintiffs presented evidence on Bussey's citizenship, a further hearing was scheduled for October 23, 1973, to allow further evidence.

On October 23, 1973, however, plaintiffs filed a motion for leave to amend their complaint by adding three additional counts against some of the defendants, including Robert Bussey. These proposed counts alleged violations of federal securities acts, specifically 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5 (hereinafter 10b–5). As the existence of these federal claims would render moot the citizenship of Robert Bussey under the prior diversity claims, the Court continued the hearing set for October 23, and directed the parties to submit memoranda on the legal sufficiency of the additional counts. Defendants filed memoranda contending that the proposed 10b–5 counts were legally insufficient and did not give the Court independent federal jurisdiction. Hearing was scheduled for December 20, 1973, at which time the Court heard oral argument on the 10b–5 counts.

██ The Court has considered the jurisdictional matters presented to it, and has concluded that the proposed counts do state a claim for relief under 10b–5, sufficient to withstand motions to dismiss, and that plaintiffs' motion for leave to amend should be granted. The Court has further concluded that the viable 10b–5 claims against some of the defendants give this Court jurisdiction over all of the claims presented in plaintiffs' complaint, and that the pending motions to dismiss should be denied.

## § 10b–5 AND THE PURCHASER–SELLER REQUIREMENT

██ This Court has in two prior extensive orders related the allegations of plaintiffs' complaint in some detail. It is not necessary to reiterate those allegations. It is necessary, however, to emphasize the fact that these matters are before the Court on motions to dismiss, and that the allegations must therefore be taken as true. Furthermore, the test which this Court must apply to the allegations is whether plaintiffs will be able to demonstrate any set of facts in support of their claim, entitling them to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiffs' proposed additional counts relate to defendants Bussey, Pearson, Baker, Cruz and Valdes, all former officers, directors, and principal shareholders in B–A Bank and its subsidiaries. In Count VIII, plaintiffs allege violations of 10b–5 by defendants Pearson,

Bussey, and Baker. Plaintiffs, as liquidators, are suing on behalf of B–A Bank and its depositors and creditors. In support of their 10–B–5 claim plaintiffs allege: 1) That B–A Bank was an investment bank in which persons deposited sums of money under time deposit agreements or savings account agreements which provided fixed rates of interest to the depositors and in which more than 50% of the depositors are citizens of the United States; 2) That the defendants entered into fraudulent schemes with the purpose of appropriating the assets of B–A Bank to their own use and benefit; 3) That this was done by virtue of their control over B–A Bank and its subsidiaries; 4) That they caused the bank to enter into transactions with this fraudulent scheme in mind, and appropriated most of the assets of the bank to their own use, to the detriment of the depositors and creditors; and, 5) That the assets which they so appropriated were bank deposits, a shopping center located in Florida, and the ownership of the controlling stock in two Florida banks owned by a subsidiary of a subsidiary of B–A Bank.

Among the fraudulent transactions allegedly executed by the defendants for the purpose of appropriating assets were the following: 1) 100% ownership in B–A Bank was sold by Pearson, Bussey and Baker to Dr. Cruz, another defendant, through the fraudulent device of causing B–A Bank to loan Dr. Cruz the purchase price from the assets of the Bank in return for a promissory note and a pledge of worthless stock in a nonexistent airline. As a result of this transaction, defendants diverted $3.8 million in B–A Bank's assets to themselves. 2) Pearson, Bussey and Baker fraudulently attempted to divest B–A Bank of its ownership in Holdings, its principal subsidiary, and to appropriate its ownership to themselves or their assignees. 3) Pearson, Bussey and Baker caused B–A Bank to issue to Holdings a $3 million line of credit, knowing that Holdings was insolvent and unable to repay, thereby further diverting assets

from B–A Bank to themselves. 4) Defendants sold to B–A Bank the common stock of Killarney Ltd. for $1.8 million. The sale was fraudulent because B–A Bank was the true owner of the stock and the $1.8 million purchase price was far in excess of the value of the stock. 5) Defendants caused Bancorp, the subsidiary of Holdings, to sell to themselves the stock in two Florida banks, American National and Citizens, which they then sold to defendants Bassett, Johnson, and Exchange, and converted the purchase money to themselves. By virtue of its ownership of Bancorp, B–A Bank was the true owner of the banks. This sale took place within the Middle District of Florida. 6) Within the Middle District defendants caused Holdings to sell its stock in Britton Plaza to B–A Bank for $2 million and appropriated these assets to themselves. 7) Defendants caused B–A Bank to make fraudulent loans, mortgages, and property transfers to themselves in their individual capacities, most of which transactions occurred in the Middle District.

Plaintiffs allege that the foregoing series of transactions constituted a "scheme to defraud" B–A Bank through the purchase and sale of securities in violation of Rule 10b–5, and took place partially within the Middle District and through the use of interstate commerce and the United States mails. Plaintiffs sue in Count VIII for over $10 million in damages.

Count IX is directed against defendant Frank Valdes, who allegedly prepared false and fraudulent financial statements concerning the financial condition of B–A Bank for the purpose of furthering the conspiracy to "plunder the assets of B–A Bank."

Count X is directed against defendant Dr. Frederico Cruz, who allegedly bought B–A Bank from the defendants Pearson, Bussey and Baker. Plaintiffs allege that after the license of B–A Bank had been suspended by the Bahamian government, Cruz continued to offer bank deposit agreements to the public, including a substantial number

of depositors in the United States. Plaintiffs further allege that Cruz appropriated 2 million in these deposits for his own use, and that the conversion of the deposits constituted a violation of 10b–5. The offer and sale of bank deposits occured, among other places, within the Middle District. Plaintiffs seek damages, an accounting, and a constructive trust against Cruz.

The proposed additional counts allege violations of the federal securities laws, specifically, 10b–5. The statute provides.

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The S.E.C. regulations, 17 C.F.R. § 240.-10b–5, provide

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

■■ Rule 10b–5, as a part of the overall plan of the securities laws of the United States, attempts to prevent inequitable and unfair practices on securities exchanges and over-the-counter markets, and insure fairness and honesty in securities transactions generally. S. E. C. v. Texas Gulf Sulpher Co., 401 F.2d 833, 847–848 (2 Cir. 1968). Congress wrote Section 10(b) "as a 'catch-all' meant to reach practices employed in connection with the purchase or sale of securities which were contrary to the public interest or the interest of investors." Herpich v. Wallace, 430 F.2d 792, 801 (5 Cir. 1970). *See* Hearings on Stock Exchange Regulation Before the House Comm. on Interstate and Foreign Commerce, 73rd Cong., 2nd Sess. 115 (1934). The federal statute and regulation, therefore, are designed to encompass the infinite variety of devices that are alien to the "climate of fair dealing" that Congress sought to create and maintain. S. E. C. v. Capital Gains Research Bur., 375 U.S. 180, 201, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The construction of the statute and the rule must be broad and flexible so that their remedial purposes will be effectuated. Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

Defendants allege in their memoranda that the plaintiffs lack standing to sue under 10b–5 for the acts alleged in the additional counts. "Standing" is a constitutional and jurisdictional concept which seeks to determine whether the interest sought to be protected by the plaintiffs is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Ass'n of Data Processing Service Organ. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ Private actions brought to enforce liabilities and duties created by 10b–5 are recognized in the Fifth Circuit. Reed v. Riddle Airlines, 266 F.2d 314 (5 Cir. 1959). The private right of

action under 10b–5 may be invoked by a shareholder on behalf of his corporation in a shareholder's derivative suit. Rekant v. Desser, 425 F.2d 872 (5 Cir. 1970). The Fifth Circuit has, however, limited standing under 10b–5 to *purchasers* and *sellers* of securities. A direct action cannot be maintained by an individual or corporation under 10b–5 unless that individual was a purchaser or seller of securities. Herpich v. Wallace, 430 F.2d 792 (5 Cir. 1970). *See* Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir. 1952).

■ The holding in *Herpich* was based on the words of the rule itself, i. e., "in connection with the *purchase or sale* of any security." The "purchaser-seller" doctrine thus requires that those seeking to bring an action for damages as a result of a violation of 10b–5 must show an invasion of their own federally protected right to engage in securities transactions free from fraud or schemes to defraud. This is not to say, however, that courts should apply a strict common law definition of "purchases" and "sales." Hooper v. Mountain State Securities, 282 F.2d 195 (5 Cir. 1960). "In deciding whether a plaintiff has standing, we search for what will best accomplish the congressional purpose." *Herpich*, 430 F.2d at 806. In this way, the broad intent of Congress is not frustrated by "the use of novel or atypical transactions." *Id.* at 807.

Defendants contend that the fraud described in Count VIII is not alleged to have occurred in connection with the purchase or sale of "time deposits" in B–A Bank. Additionally, defendants contend that plaintiffs may not sue under 10b–5 for the allegedly fraudulent transfer of the two Florida banks, which were owned by a subsidiary of a subsidiary. By maintaining a direct action for violation of 10b–5, defendants contend that plaintiffs, as liquidators of B–A Bank, cannot sue on behalf of Bancorp for the transfer of the Florida banks to defendants Bassett, Johnson, and Exchange.

Defendants further argue that plaintiffs, as liquidators, cannot sue upon any cause of action accruing on behalf of owners of time deposits in B–A Bank unless plaintiffs sue derivatively for the owners of time deposits. At the hearing on the 10b–5 motions, defendants argued that plaintiffs stand in the shoes of the Bank, not depositors, and are thus not direct purchasers or sellers of time deposits. Defendants point to the language in the proposed 10b–5 counts, "brought for the benefit of depositors. . . . " as grounds for their contention that plaintiffs are attempting to sue derivatively.

■■ The Court is of the opinion, however, that these arguments do not correctly state the law regarding private 10b–5 actions. There can be no doubt that the time deposits in B–A Bank were securities within the meaning of the securities laws. A certificate of deposit issued for cash by a bank can be considered a security within the meaning of 10b–5. Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co., 300 F.Supp. 1083 (S.D.N.Y.1969), rev'd on other grounds, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The fact that a transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of 10b–5. *Hooper, supra,* 282 F.2d at 201.

■ Defendants incorrectly attempt to denominate a suit by a liquidator on behalf of depositors as a derivative action. Derivative actions are a procedurally specialized form of action brought by a shareholder of a corporation on behalf of the corporation itself. Rule 23.1 Federal Rules of Civil Procedure. A liquidator of a bank does not occupy the same position with regard to the bank as a shareholder in the bank. For purposes of liquidation, the liquidator *is* the bank, and represents the interests of depositors and creditors. He has, upon taking charge of the bank, all the rights and equities in favor of the bank and may sue thereon or therefor to recover the assets of the bank and for the benefit of the depositors, creditors, and stockholders. Love v. Robinson, 161

Miss. 585, 137 So. 499 (1931). *Cf.* Power v. Amos, 94 Fla. 411, 114 So. 364 (1927).

By way of comparison, claims for the recovery of assets of a corporation for which a receiver has been appointed must be asserted in the name of the receiver, and not by a stockholder. Davis Trust Co. v. Hardee, 66 App.D.C. 168, 85 F.2d 571 (1936). "[T]he stockholder has no right to proceed in his own name to assert a right of the association even where the benefits will inure ultimately to himself." *Id.* at 574. Where there is alleged a breach of duty by directors and managing officers of a corporation, causing loss of its assets, the corporation may sue, and if it is insolvent, the action can be maintained by a receiver. Besseliew v. Brown, 177 N. C. 65, 97 S.E. 743.

Thus in the instant case the owners of the time deposits cannot bring an action themselves to recover assets of the bank. The liquidators are the proper parties to bring suit, and in doing so, they are not suing derivatively as a shareholder pursuant to Rule 23.1, but are rather exercising their rights as liquidators to recover assets of B–A Bank. Although suing *for the benefit* of depositors and creditors, the liquidators are not suing derivatively within the traditional meaning of that term.

Defendants also incorrectly attempt to place a narrow meaning on the words "purchase" and "sale" as used in 10b–5. Defendants argue that there is no allegation that the time deposits were ever purchased or sold, so as to warrant a 10b–5 action for their fraudulent transfer. Under the purchaser-seller requirement, as recognized by the Fifth Circuit in the *Herpich* case, there must have been a purchase or sale of the time deposits in order for there to be a claim for relief under 10b–5.

In two recent 10b–5 cases, the Fifth Circuit has adopted the "forced seller" doctrine. Dudley v. Southeastern Factor & Finance Corp., 446 F.2d 303 (5 Cir. 1971); Coffee v. Permian Corp., 434 F. 2d 383 (5 Cir. 1970). The forced seller doctrine is derived from two Second Circuit cases which held that the purchaser-seller requirement of 10b–5 is met, even where there is no actual sale of stock, if the alleged actions of the defendants rendered the stock worthless. Crane Co., v. Westinghouse Air Brake Co., 419 F.2d 787 (2 Cir. 1969); Vine v. Beneficial Finance Co., 374 F.2d 627 (2 Cir. 1967). The shareholder "as a practical matter" has no choice but to surrender his interest in the corporation and to exchange his shares for cash.

In the *Coffee* case, a minority shareholder sued the 80% owner of stock in his corporation, alleging that the corporation had been substantially liquidated solely for the benefit of the 80% owner, and that the assets of the corporation were appropriated to the 80% owner. The Fifth Circuit applied the reasoning from *Vine* and stated that *Vine* turned "on whether the shareholders, as a result of the statutory merger, have in substance become sellers despite the fact that they still hold stock certificates in a non-functioning corporation." *Coffee*, 434 F.2d at 386. The Court held that the liquidation in *Coffee* was similar in result to the merger in *Vine*, and that "[I]n both instances [*Vine* and *Coffee*] the shareholder 'as a practical matter' has no choice but to surrender his interest in the corporation and to exchange his shares for cash." *Id.*

In *Dudley*, the receiver of Insurance Investors Trust Company (IITC) sued on its behalf a corporation in which IITC had a preferred stock investment, alleging that the corporation had been liquidated, that IITC had been defrauded by the actions of the corporation, and that IITC's investment in the corporation had been reduced to a mere speculative right to a payment of money from the liquidation. The Fifth Circuit followed the reasoning in *Coffee* and held that a "shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of mon-

ey for his shares." *Dudley*, 446 F.2d at 307.

Applying the forced seller doctrine to the facts *as alleged* in this case, it is apparent that plaintiffs as liquidators may sue defendants in connection with the "sale" of the time deposits. Plaintiffs have alleged that as a result of the fraudulent scheme of defendants the assets of B–A Bank have been plundered, and the Bank has been suspended from operation and is undergoing liquidation. No better example of "sellers" under 10b–5 can be found than in this case. As a result of the alleged fraudulent transactions of defendants, the time deposits of the Bank have been reduced to a mere claim for a portion of the remaining assets of the Bank in the liquidation proceedings, and the time depositors are now depositors in a defunct bank. By suing as liquidators of the Bank, plaintiffs are suing to remedy a fraudulent scheme made "in connection with the purchase or sale of a security."

This reasoning also applies with regard to the alleged sale of the two Florida banks to Bassett, Johnson, and Exchange, because although B–A Bank itself did not purchase or sell the stock in the banks, its own assets were substantially reduced as a result of the sale of the banks, thereby contributing to its liquidation. Thus, this suit may be maintained by the liquidators against the alleged perpetrators of the fraudulent transfer even though the banks sold were twice removed from B–A Bank in the intricate corporate structure of B–A Bank and its subsidiaries. It is not the stock in the Florida banks which supports the claim for relief under 10b–5, but rather the reduction in B–A Bank's assets, thus amounting to a "forced sale" of time deposits. The liquidation of the Bank provides the "sale" necessary to support a suit under 10b–5, and the action is not "frustrated by the use of novel or atypical transactions." A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2 Cir. 1967).

## EXTRATERRITORIAL APPLICATION

Many of the securities involved in the transactions alleged by plaintiffs are not American securities. Additionally, there is no allegation that any American securities markets are involved in the suit. Defendants contend that the proposed amendment counts do not state a claim for relief because the transactions did not take place within the jurisdiction of the United States or this Court. Of the transactions alleged in Count VIII, only three are alleged to have taken place in the United States and the Middle District of Florida. There is no allegation that the remaining fraudulent transactions took place within the United States.

Section 10(b) was not intended to impose rules of conduct on transactions occurring outside the United States when the only connection with the United States is the citizenship of the purchaser or seller. Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326 (2 Cir. 1972). The *Leasco* case held that 10b–5 was applicable therein even though no American securities markets were involved and even though some of the steps in the transaction occurred outside the United States. Substantial misrepresentations were made within the United States, and the impact of the fraudulent scheme was felt within the United States. This, the Court held, was sufficient to invoke 10b–5. *See also* Ferraioli v. Cantor, 259 F.Supp. 842 (S.D.N.Y.1966).

Defendants argue that some of the transactions occurred outside the United States and that plaintiffs may not sue on these transactions. As to the transactions that did occur within the United States, defendants attempt to show that these transactions do not support a 10b–5 action.

One of the American transactions which defendants concentrate on is the alleged sale of the two Florida banks, owned by a twice removed subsidiary, to some of the defendants. Using the *Her-*

*pich* analysis discussed above, defendants contend that this transaction does not support a direct action against the defendants. For the reasons given above, however, the Court has held that the sale of these banks under the circumstances as alleged do support a 10b–5 direct action for the fraudulent "sale" of B–A Bank's major assets.

■ Plaintiffs correctly point out that the various transactions alleged in Count VIII are all a part of a broad scheme by the defendants to fraudulently deplete the assets of B–A Bank and convert them to their own benefit and use. Some of the fraudulent transactions making up a part of the scheme took place within the jurisdiction of this Court. It is alleged that more than half of the depositors in B–A Bank are American citizens. It is also alleged that the scheme to defraud utilized interstate commerce and the United States mails. It is thus apparent that the scheme alleged by plaintiffs had a significant impact on American investors and that this Court has jurisdiction over the subject matter of this suit, despite the fact that many of the steps in the fraudulent scheme occurred outside the United States.

■ The Court thus concludes that it does have subject matter jurisdiction over the claims asserted by plaintiffs in their proposed additional counts. It is thus no longer necessary to determine the citizenship of Robert Bussey for diversity purposes. The 10b–5 claims against Bussey, Baker, Pearson, Cruz, and Valdez support this federal action against them. Plaintiffs may, of course, join their state claims for breach of corporate fiduciary duties against these defendants under Rule 18(a), Federal Rules of Civil Procedure.*

■ The Court also has jurisdiction over the state claims against Bassett, Johnson, and Exchange, because there is diversity between these Florida defendants and the Bahamian plaintiffs. Thus, under Rule 20(a), they may be joined in this action with the other defendants, as plaintiffs' claims against them arise out of the same series of transactions and involve the same nucleus of operative fact. *See* Wright & Miller, Federal Practice and Procedure, vol. 7 § 1659 (1972).

For the foregoing reasons, the following motions are hereby DENIED: 1) Pearson and Baker's motions to dismiss, filed May 24, 1973; 2) Exchange's motion to dismiss, filed May 16, 1973; 3) Bussey's motion to dismiss, filed May 21, 1973; and 4) Plaintiffs' motion to sever, filed August 30, 1973.

The Court has heard argument on the legal sufficiency of the proposed amendments to plaintiffs' complaint, and in view of the foregoing holdings of this Court, plaintiffs' motion for leave to amend their complaint, filed October 23, 1973, is hereby GRANTED. The Court Clerk is directed to file the additional counts VIII, IX, and X, attached to plaintiffs' motion for leave to amend.

The Court having already heard argument by Robert Bussey on the legal sufficiency of the additional counts, and having denied prior motions to dismiss, defendant Robery Bussey is hereby directed to file his answer to plaintiffs' second amended complaint, including the additional counts VIII, IX, and X, within twenty (20) days from the date of this order.

The remaining defendants are hereby directed to file answers to the additional counts VIII, IX, and X within twenty (20) days from the date of this order.

■ Exercising its discretion under 28 U.S.C. § 1292(b), the Court has determined that Bassett and Johnson's motion for an order permitting an interloc-

---

* It should be noted that the 10b–5 claims against these defendants and the state claims are distinguishable. The state claims relate to breach of corporate fiduciary duties owed to B–A Bank by the defendants. The 10b–5 claims involved additional allegations of fraud by the defendants in a broad scheme to appropriate the assets of B–A Banks.

utory appeal to the Fifth Circuit, filed May 29, 1973, should be, and it is hereby denied.

On January 2, 1974, counsel for Dr. Federico Cruz filed a motion to withdraw as counsel for defendant Cruz. Attached to the motion is a notarized signed consent to the withdrawal by Dr. Cruz. There is, however, no mention made of any substitute counsel for Dr. Cruz, and no new attorney has filed an appearance for Dr. Cruz. Accordingly, the motion to withdraw as counsel is hereby Denied.