732 F.2d 850
 39 Fed.R.Serv.2d 378
 Graham C. GARNER, etc., et al., Plaintiffs-Appellees,
v.
Tazwell W. PEARSON, individually and as Trustee for Philip
Theodore Pyfrom and Lissay Pyfrom, minors, Robert
N. Bussey, Donald N. Baker, Defendants-Appellants,
and
William M. Bussey, et al., Defendants.
 No. 82-5746.
 United States Court of Appeals,
Eleventh Circuit.
 May 21, 1984.
 
 Michael L. Kinney, Tampa, Fla., for Pearson and Baker.
 Albert I. Gordon, Tampa, Fla., for Robert N. Bussey.
 James A. Dixon, Jr., Miami, Fla., Brian J. Gallagher, New York City, for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.
 GODBOLD, Chief Judge:
 
 
 1
 This case involves the propriety of a grant of partial summary judgment entered in favor of the liquidators of a failed Bahamian bank against three of its former officers and control persons who used bank funds to purchase stock for their own accounts without repaying the bank. We affirm.
 
 I. Background
 
 2
 Defendants Tazwell W. Pearson, Robert N. Bussey, and Donald R. Baker established the British-American Bank, Ltd., (B-A Bank) in Nassau in 1966. In 1972 the Bahamas Supreme Court placed B-A Bank in compulsory liquidation and appointed Bernard Gadd as the bank's first liquidator. Gadd resigned in 1973, and the present plaintiffs succeeded him. Gadd sued the defendants for an accounting of their dealings in various bank assets and damages for the conversion of those assets. Diversity jurisdiction appeared questionable, and Gadd added a federal securities claim against the defendants. The complaint also stated a claim against Exchange Bancorporation, Inc., for the imposition of a constructive trust upon shares of the Citizens Bank of Clermont, which Exchange purchased from the defendants allegedly with notice that B-A Bank claimed the shares as provider of the funds for their purchase.
 
 
 3
 Plaintiffs moved for partial summary judgment against the individual defendants and Exchange for conversion of the Citizens Bank stock. Plaintiffs contended that defendants caused B-A Bank to provide the funds for defendants' purchase of the stock, that the defendants used those funds for the purchase of the stock for their own accounts, and that defendants never repaid B-A Bank for the funds it provided toward the purchase even after the stock was sold to Exchange. The district court granted partial summary judgment for plaintiffs and against defendants and Exchange for the value of the stock at the time of conversion plus prejudgment interest, a total of just under $4 million.
 
 
 4
 On appeal defendants argue only two points that merit discussion: (1) that this court lacks subject matter jurisdiction over this action because the federal securities law claim, to which the pendent state law claim for an accounting of the Citizens stock is attached, is defective; and (2) that several genuine issues of material fact preclude the grant of partial summary judgment under Fed.R.Civ.P. 56(c).
 
 
 5
 Upon submissions and argument by the parties the district court found the following undisputed facts:
 
 
 6
 (1) At all material times, Bussey, Pearson and Baker were control persons of the B-A Bank and the entire British-American corporate complex, including British-American Holdings S.A. (the "B-A Fund"), British American Bancorporation Inc. ("B-A Bancorp"), the American National Bank and Trust Company of South Pasadena, Florida (the "American Bank"), and, after its purchase, the Citizens Bank of Clermont (the "Citizens Bank").
 
 
 7
 (2) The B-A Bank always owned a majority, and in October, 1971 it owned all but six of the 405,608 issued and outstanding shares of the B-A Fund.
 
 
 8
 (3) The B-A Fund owned B-A Bancorp which had acquired 73% of the issued and outstanding stock of the American Bank with money supplied by the B-A Bank.
 
 
 9
 (4) Bussey, Pearson and Baker caused the B-A Bank to provide the funds used by Bussey and Pearson to purchase the Citizens Bank Stock in 1970.
 
 
 10
 (5) On January 9, 1970, Bussey and Pearson appear to have entered into a written agreement with B-A Bancorp[3] (the "B-A Bancorp Agreement"). That agreement permitted Bussey and Pearson to purchase the Citizens Bank Stock and register title in their personal names only until the Federal Reserve Board should approve B-A Bancorp's ownership of that stock, and required them to turn the stock over to B-A Bancorp upon such approval or dispose of the stock if approval were to be denied. The Bancorp Agreement placed the entire financial burden, and all benefits, of this transaction on B-A Bancorp.
 
 
 11
 3. Plaintiffs have disputed the bona fides of this document but have conceded its existence and terms for the purpose of their motion for partial summary judgment.
 
 
 12
 (6) Bussey and Pearson registered the Citizens Bank Stock in their personal names, presumably pending regulatory approval of the ownership of that stock by B-A Bancorp.
 
 
 13
 (7) The Federal Reserve Board refused to approve the B-A Bancorp's proposed ownership of the Citizens Bank Stock and pressed Bussey to divest that stock during the fall of 1971.
 
 
 14
 (8) On October 25, 1971, Bussey, Pearson and Baker caused the B-A Bank to transfer all of its stock in the B-A Fund to the B-A Fund itself. They caused the B-A Fund to pay for these shares by: (a) issuing an unsecured, non-amortizing twenty-year note for $3 million from the B-A Fund to the B-A Bank; (b) returning the stock of Britton Plaza, Inc. ("Britton Plaza") to the B-A Bank at a stated value of $2 million[4] (Britton Plaza was a Florida shopping center which the B-A Bank had purchased in 1968 and transferred to the B-A Fund in 1969 in exchange for B-A Fund shares valued at $950,000); and (c) returning the stock of Killarney, Ltd. ("Killarney") to the B-A Bank at a stated value of $1.8 million. (Killarney was the Nassau Pepsi Cola bottler which Pearson had purchased on October 21, 1971, four days earlier, for $765,000, paid by the B-A Bank.)
 
 
 15
 4. The Britton Plaza stock was transferred the same day to Bussey as security for a $170,000 loan by him to the B-A Bank. Bussey subsequently called the debt and sold Britton Plaza for approximately $500,000.
 
 
 16
 (9) After October 25, 1971, Bussey, Pearson and Baker continued to control the B-A Fund.
 
 
 17
 (10) On October 25, 1971, Pearson also caused all of the issued and outstanding shares of the B-A Bank to be transferred to Dr. Federico Cruz ("Cruz"). Cruz purported to pay for these shares by delivering his $3.8 million promissory note to the B-A Bank.
 
 
 18
 (11) On December 23, 1971, Bussey and Baker[5] personally contracted to sell the Citizens Bank Stock to Exchange under terms: prohibiting encumbrances upon that stock; but, permitting Bussey to borrow $1 million on that stock pending the closing of the sale to Exchange; and, requiring the repayment of any such interim loan, the clearing of any pledge lien, and the tender of unencumbered title at the eventual closing. The closing was to be held when Exchange had obtained regulatory approval to buy the Citizens Bank Stock.
 
 
 19
 5. Pearson apparently had transferred his "ownership" interest in the Citizens Bank Stock to Bussey and Baker at some point during the fall of 1971. However, the stock remained registered in his name.
 
 
 20
 (12) Pursuant to that purchase agreement, on December 28 and 29, 1971, Bussey borrowed the $1 million from First National Bank of Orlando ("First National"), secured by substantially all the Citizens Bank Stock. He deposited the proceeds of that loan in the B-A Fund's account at the American Bank, from which he and Baker immediately disbursed that $1 million to Pearson.
 
 
 21
 (13) On February 28, 1972, and May 5, 1972, the Wall Street Journal reported that the B-A Bank claimed to own the Citizens Bank and the American Bank. The Exchange officers responsible for handling the pending purchase of the Citizens Bank Stock from Bussey and Baker read these articles.
 
 
 22
 (14) On March 6, 1972, Bussey and Pearson held a press conference with the St. Petersburg Times to deny the B-A Bank's then-public claim to ownership of the Citizens Bank. The Exchange officers responsible for handling the pending purchase of the Citizens Bank Stock from Bussey and Baker read the St. Petersburg Times account of Bussey and Pearson's denial of the B-A Bank's public claim to ownership of the Citizens Bank--and thus were aware of the claim itself.
 
 
 23
 (15) Thereafter, Exchange verified that Bussey, Pearson and Baker were the registered owners of the Citizens Bank Stock and obtained quitclaim disclaimers of any interest in that stock from Pearson, B-A Bancorp and the B-A Fund.
 
 
 24
 (16) During the period following his May 11, 1972 appointment as Provisional Liquidator of the B-A Bank, Bernard Gadd and his Florida counsel attempted, without success, to discover what disposition was to be made of the Citizens Bank Stock.
 
 
 25
 (17) On July 17, 1972, Bussey, Pearson and Baker transferred the Citizens Bank Stock to Exchange "free and clear of all encumbrances" in exchange for $2,385,395.12. A portion of the proceeds of that purchase was simultaneously used to repay the loan balance due from Bussey to First National and clear its interim pledge lien.
 
 
 26
 (18) Bernard Gadd, then the Official Liquidator of the B-A Bank, learned of the sale to Exchange on July 18, 1972, and brought this suit on July 24, 1972.
 
 
 27
 (19) On October 21, 1974, B-A Bancorp was dissolved.
 
 
 28
 545 F.Supp. at 553-55.
 
 
 29
 II. Subject matter jurisdiction over the pendent state claim
 
 
 30
 for an accounting of the Citizens stock
 
 
 31
 Count VII of the complaint alleged that the liquidator sued on behalf of the creditors and depositors of B-A Bank under Sec. 10(b) and rule 10b-5 of the Securities Exchange Act of 1934 for the fraudulent sale of time deposit and savings account agreements by defendants. Plaintiffs filed suit in 1972. The defendants argue that the securities fraud claim is defective and that this court accordingly has no jurisdiction over the state law claim pendent to the federal one. Although later cases suggest the present nonviability of the federal claim,[1] we need not decide if the federal claim is now in fact defective.
 
 
 32
 Assuming without deciding that the federal claim does not now state a cause of action, we do not automatically dismiss the pendent claim. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 726, 86 S.Ct. 1130, 1138, 1139, 16 L.Ed.2d 218 (1966), makes clear that federal jurisdiction to try a pendent claim exists even when the federal claim is dismissed before trial if the federal claim was "not insubstantial." See O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54, 63 (7th Cir.1979). Under this test, if there is "any foundation of plausibility to the claim federal jurisdiction [over the pendent claim] exists." 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3564, at 428 (1975). In 1974, upon motion of defendants to dismiss the federal claim, the district court exhaustively reviewed that claim and held that it stated a cause of action. See 374 F.Supp. 591, 593. That opinion evidences a "foundation of plausibility" and shows that the claim was not insubstantial when brought. See id. Once the court determines that the federal claim is not insubstantial, it has discretion to retain jurisdiction over the pendent claim even if the court dismisses the federal claim. See O'Brien; Reid v. Hughes, 578 F.2d 634, 636 n. 1 (5th Cir.1978). And whether the state claim would be time barred if dismissed from the federal suit is "certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved." Pharo v. Smith, 625 F.2d 1226, 1227 (5th Cir.1980); see also Quality Foods de Centro America, S.A. v. Latin American Agribusiness Development Corp., 711 F.2d 989, 999-1000 (11th Cir.1983); Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982).
 
 
 33
 In 1981, after the entry of partial summary judgment for plaintiffs, the district court denied defendants' motion to dismiss for lack of subject matter jurisdiction but did not enter an order or memorandum opinion. We can infer, however, that, even if the district judge found that the federal securities claim no longer stated a cause of action, in his discretion he chose not to dismiss the pendent claim because all conceivable state statutes of limitations had run and the federal claim was not insubstantial or without plausible foundation when brought. The district court properly denied defendants' motion to dismiss.
 
 III. Factual disputes
 
 34
 The defendants contend that genuine issues of material fact, which preclude summary judgment under rule 56, exist over whether B-A Bank controlled B-A Fund, whether B-A Bank (as opposed to B-A Fund) paid for the Citizens stock, and whether the October 25, 1971 transaction was a sham.[2]
 
 
 35
 Based on the parties' submissions we find beyond dispute that the defendants controlled the B-A Bank and the subsidiaries that they had the bank set up. The relevant transfers of funds by or among these entities bear the signature or approval of Pearson, Bussey, or Baker. Even the acquisition agreement for the Citizens shares was signed by Bussey for himself and B-A Bancorp (with Baker attesting for B-A Bancorp) and by Pearson for himself.
 
 
 36
 Defendants contend that a dispute exists over whether B-A Bank owned or controlled B-A Fund and cite the transaction of October 25, 1971 as divorcing B-A Fund from B-A Bank and also cite parallel litigation in Luxembourg that held that B-A Bank did not currently own B-A Fund. As the plaintiffs point out, this issue is irrelevant to the present action. The district court found that the B-A Bank owned B-A Fund prior to the October 25, 1971 transaction and that the defendants still controlled the B-A Fund thereafter. The defendants contend that the B-A Bank did not own B-A Fund after October 25, 1971 and that the result of the Luxembourg litigation supports this. The documents conclusively show that the B-A Bank owned and controlled the B-A Fund prior to the October 25 transaction. Thus when the defendants caused B-A Bank to provide the funds for the purchase of the Citizens stock through B-A Fund in 1970, B-A Bank owned and controlled B-A Fund. Whether record ownership of the shares of B-A Fund rested in B-A Fund itself or B-A Bank after October 25 does not erase B-A Bank's prior ownership, which facilitated the purchase of the Citizens stock.
 
 
 37
 Defendants also contend that B-A Fund, not B-A Bank, paid for the Citizens stock. This argument ignores that B-A Fund, which defendants controlled, obtained all of that money from B-A Bank. In other words, B-A Bank funds merely passed through B-A Fund before entering defendants' hands for the purchase of the Citizens stock. One million dollars of this purchase price came from a loan by the Chemical Bank New York Trust Co. made to B-A Bancorp on the credit of B-A Bank in April 1970. B-A Bank continued to repay this loan. Each month the defendants transferred the required amount from B-A Bank to B-A Fund to Chemical Bank. The rest of the purchase price came from funds that defendants moved from B-A Bank to B-A Fund's account at American Bank. Even Baker admitted that B-A Bank provided virtually all of the funds for the Citizens stock purchase.
 
 
 38
 Finally, defendants contended for the first time at oral argument that a genuine issue of material fact existed over whether the October 25, 1971 transaction, which at the hands of the defendants left B-A Fund owning itself, was a sham. We need not decide whether this transaction constituted a sham for all purposes so as to require the defendants to account to B-A Bank for all of the consequences of the transaction. Subsequent litigation below can resolve defendants' dealings in other than the Citizens stock. The October 25, 1971 transaction is relevant only so far as defendants claim that it expunged the liabilities of Bussey, Pearson, and Baker to B-A Bank for the conversion of the Citizens stock. We need only review the undisputed terms of the transaction to determine if B-A Bank received payment for the Citizens stock. Upon reviewing the terms of that transaction, see undisputed fact No. 8, we note that B-A Bank did not even receive the value of the purported consideration for the transfer, much less an amount sufficient to expunge defendants' liability for the Citizens stock conversion. This transaction did not erase defendants' liability to B-A Bank. No genuine issue of material fact precludes the grant of partial summary judgment in this case.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 See Marine Bank v. Weaver, 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982) (bank certificate of deposit is not a security); Santa Fe Indus. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (breach of fiduciary duty by controlling shareholders, officers, or directors absent deception, misrepresentation, or nondisclosure does not violate rule 10b-5); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (only a purchaser or seller of securities may maintain a cause of action under rule 10b-5)
 
 
 [2]
 Defendants also contend for the first time on appeal that Garner's affidavit is not based on personal knowledge as required by Fed.R.Civ.P. 56(e). Since defendants raised this matter neither in their memorandum in opposition to summary judgment nor in the hearing on the motion, we will not consider this argument now. See Troxler v. Owens-Illinois, Inc., 717 F.2d 530, 533 (11th Cir.1983), and cases cited therein