**ALPEX COMPUTER CORP., Plaintiff,**

v.

**PITNEY–BOWES, INC., et al.,
Defendants.**

No. 73 Civ. 5198.

United States District Court,
S. D. New York.

July 15, 1976.

As Corrected Sept. 13, 1976.

Alvin M. Stein, Stephen F. Harmon, Sheldon M. Greenbaum, Parker, Chapin & Flattau, New York City, for plaintiff.

William E. Willis, Francis Carling, Margaret Pfeiffer, Sullivan & Cromwell, New York City, for defendants Pitney-Bowes, Inc. and the individual defendants.

## OPINION AND ORDER

PIERCE, District Judge.

As this matter is being prepared for trial, defendant Pitney-Bowes, Inc. and certain individual defendants move for partial summary judgment against plaintiff's claims under Rule 10b–5. Despite the fact that the record on this motion is in excess of 1300 pages, there is one issue of law which immediately arises untrammeled by any question of material fact. That issue is whether the forced "wind-down" of Pitney-Bowes Alpex, Inc. ("PBA"), accomplished by defendants over the objections of plaintiff, constituted a "purchase or sale" of securities as that term is defined under the Securities Exchange Act of 1934. Having concluded that this issue is appropriate for summary disposition, the Court grants the motion for summary judgment to that extent, and reserves decision on the remainder of defendants' motion. The following facts are not in dispute.

Beginning in late 1969, the parties hereto began negotiations towards the formation of a joint venture to develop plaintiff's concept of a computerized retail store cash register, known as the SPICE system. Plaintiff Alpex Computer Corp. brought to the venture its SPICE system, as well as some start-up funds. Defendant Pitney-Bowes was able to provide much greater financial resources, as well as marketing and manufacturing expertise. Under the joint venture agreement, the parties formed a third company, PBA, which issued common stock and notes to each of the parent firms; each parent held an initial interest of fifty percent.

At the beginning of PBA's history, plaintiff successfully bargained for operating control of PBA despite defendants' larger commitment to finance the venture. However, the extent of this commitment was delineated by contract.

Despite a hopeful beginning and despite no lack of a market for its product, PBA was not a successful venture. Its performance was always below predictions and the firm continually consumed funds far beyond any predictions. As more financing was required, the agreement between plaintiff and defendants was repeatedly revised, providing for more financing from Pitney-Bowes in return for various concessions by plaintiff. First, plaintiff lost its control of the board of directors; then defendants gained a majority. Later an officer of Pitney-Bowes was installed in operating control of PBA. However, for a variety of reasons, PBA continued to move steadily downhill.

A major modification of the agreement between the parties, effected in April 1973, provided that Pitney-Bowes would assist in desperately needed financing in return for the option to increase its stock position in PBA to majority control upon the occurrence of any of a number of adverse financial events. By June 1973, PBA was again in troubled financial waters and under the provisions of the April 1973 agreement, Pitney-Bowes increased its stock ownership in PBA to sixty-four percent.

When defendants took control of PBA, they undertook studies to determine PBA's prospects for the future. After reaching the conclusion that PBA could not be expected to operate profitably on its own, defendants began to seek a purchaser for PBA. However, by November 1973, defendants had abandoned this alternative.

It is against this background that the "wind-down" of PBA was accomplished. At a meeting of the PBA Board held November 12, 1973, the defendant directors

voted for, and plaintiff's directors voted against, a resolution which read as follows:

"RESOLVED, That the business of this Company be wound up as soon as possible; and that the officers are authorized to take such action, to the extent permitted by the Company's resources, as they may deem necessary or appropriate in connection with such winding-up, including the conclusion of arrangements with customers concerning the cancellation, revision or fulfillment of unfilled orders." (Plf. App. at 680–84).

The above resolution marked the end of PBA as an active corporate entity. However, that action did not terminate the corporation's existence. While Pitney-Bowes states that it lost 30 million dollars through the PBA venture, and while plaintiff asserts it lost 9.5 million, it is not disputed that PBA still exists, that it still owns its principal asset, the SPICE system, and that each party still holds stock in the venture. In fact, PBA is a party to this lawsuit, represented by counsel separate from counsel for the movants.

In this action, plaintiff asserts essentially three separate Rule 10b–5 claims. First, plaintiff claims that the initial issuance of PBA shares was induced by defendants' fraud. Second, plaintiff claims that the increase in Pitney-Bowes' stock position to 64% was also procured by fraud. Finally, plaintiff asserts that the "wind-down" of PBA was fraudulent and was a "forced sale" of securities, since it transformed plaintiff's stock ownership from a share in an ongoing concern to a share in a dormant company. Only the third claim is the subject of this opinion.

In order for fraud to be actionable under the anti-fraud provisions of the 1934 Act, or under Rule 10b–5, the alleged fraud must have occurred in connection with the purchase or sale of a security; see *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Any doubts as to the continuing vitality of the *Birnbaum* rule have been lain to rest by the Supreme Court's decision in *Blue Chip Stamps v.*

*Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Plaintiff urges that the "wind-down" of PBA constituted a forced sale of securities, citing a line of case-law beginning with *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). In that case the Circuit Court held that Vine was a "seller" of his stock in Crown Financial Co. as a result of a short-form merger of that company into Beneficial Finance Co. Judge Feinberg reasoned that although Vine still held his stock certificates, he had no choice but to accept Beneficial's cash offer or pursue his right of cash appraisal in order to ever achieve any value for his stock. Thus, the court concluded, Vine eventually must become a party to a sale, and it would be a "needless formality" to require such a sale as a precondition to suit.

"Due to defendant's acts, Crown has now disappeared and plaintiff's stock has, in effect, been involuntarily converted into a claim for cash." (*Id.* 374 F.2d at 634.)

To further support this conclusion, the court noted that plaintiff's complaint alleged forced divestiture and that Beneficial clearly was a purchaser of plaintiff's stock either through the cash offer or through the appraisal process; see *id.* at 635.

Fundamental factors underlying the *Vine* analysis are absent here. First, it is undisputed that PBA still exists as a corporate entity; it has not been absorbed into Pitney-Bowes. Further, plaintiff still owns its stock in PBA and it does not appear that any right of appraisal is present. Thus, plaintiff's ownership of PBA has not been converted into solely a claim for cash.

Plaintiff urges that a corporate liquidation may constitute a "purchase or sale" of securities, and the Court agrees with that statement of the law; see *Dudley v. Southeastern Factor & Finance Corp.,* 446 F.2d 303 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *Coffee v. Permian Corp.,* 434 F.2d 383 (5th Cir. 1970). However, the problem plaintiff faces here is that there is no evidence from which a fact-finder could conclude that the "wind-

down" of PBA constituted a liquidation of assets as that term has been employed by the above cases.

In *Coffee v. Permian Corp., supra,* a minority stockholder of Knight Company was found to be a "seller" of his stock where the majority stockholder voted to liquidate the company and appropriate its assets. Although the liquidation had not yet been approved by the shareholders as required by state law, the court found that the liquidation had been "substantially completed" and that, as a practical matter, the minority shareholder had no choice but to surrender his interest in the corporation and exchange his shares for cash; see *id.,* 434 F.2d at 385–86. The court distinguished the case from one where the majority shareholder, despite apparently beginning a liquidation process, actually intended to carry on the business of the firm; see *id.* at 386.

In this action it is undisputed that there has been no formal resolution providing for liquidation of PBA's assets, nor has the board of PBA voted to dispose of its assets to Pitney-Bowes. Again, while PBA is not active, each party still holds its stock and PBA still owns its principal asset.

In *Dudley, supra,* the defendant corporation, Southeastern Factor, had conveyed virtually all its assets to a second company in return for shares of the purchaser. The shares of the purchaser company were distributed to the Southeastern Factor creditors and shareholders, with the exception of plaintiff, pursuant to a plan of liquidation. In his brief to the appellate court, plaintiff asserted that the liquidated firm " 'has no assets, no liabilities, no common shareholders, no directors, no officers, and essentially no existence.' " *Id.,* 446 F.2d at 305 n. 2.

After reviewing decisions of the Second Circuit, the court in *Dudley* stated the forced seller rule as follows:

"*Vine*'s informing principle, carried forward in *Crane [Company v. Westinghouse Air Brake Co.,* 419 F.2d 787 (2d Cir. 1969)], is that a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." (446 F.2d at 307.)

Accordingly, following also its decision in *Coffee,* the court concluded that a minority shareholder who holds stock of a firm in the process of ongoing liquidation may sue as a "seller" under Rule 10b–5. The court reached this conclusion despite the fact that the "final" liquidating dividend due the plaintiff had never been issued.

"[The company] has already been substantially liquidated and is a non-functioning corporation within the principle of *Vine* and *Coffee*; [plaintiff's] investment in a going enterprise has been commuted into a right (said to be a remote and speculative one at that) to a payment of money." (*Id.* at 308.)

Although on a motion for summary judgment, this Court is required to draw all reasonable inferences in favor of the party opposing the motion, plaintiff here has failed to produce any competent evidence to demonstrate that defendants have "substantially completed" any plan to liquidate PBA. It is undisputed that PBA still had assets, shareholders, directors, officers and a corporate existence following the winddown resolution.

More recent decisions dealing with whether a shareholder becomes a "seller" upon a radical change in the corporation's existence have all been characterized by a transformation of the shareholder's right into a claim for money, or by a termination of the entity's corporate existence involving a major transfer or distribution of assets, or both; see, e. g., *Green v. Santa Fe Industries, Inc.,* 533 F.2d 1283 [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,447 (2d Cir. 1976); *Marshel v. AFW Fabrics Corp.,* 533 F.2d 1277 [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,448 (2d Cir. 1976) (short-form merger actionable under Rule 10b–5); *Rich v. Touche Ross & Co.,* 415 F.Supp. 95 [Current Binder] CCH Fed.Sec.L.Rep. ¶ 95,514 (S.D. N.Y.1976) (liquidation under which securities holders received cash); *Bolger v. Laventhol, Krekstein, Horwath & Horwath,* 381 F.Supp. 260 (S.D.N.Y.1974) (dissolution

of limited partnership; securities converted into claim for money); *Garner v. Pearson,* 374 F.Supp. 591 (M.D.Fla.1974) (liquidators of bank as forced sellers).

While Rule 10b–5's "purchaser-seller" requirement always has been construed with appropriate flexibility, the courts nevertheless have refused to allow actions under that Rule to reach solely matters relating to the wisdom of management decisions not involving the transfer of securities; see e. g., *In re Penn Central Securities Litigation,* 494 F.2d 528, 534 (3d Cir. 1974) (corporate reorganization involving "incidental" exchange of shares not actionable despite extinguishment of appraisal rights); *Goodall v. Columbia Ventures, Inc.,* 374 F.Supp. 1324 (S.D.N.Y.1974):

> "Congress did not intend, and the *Birnbaum* rule has consistently been interpreted, to prevent the use of § 10(b) and Rule 10b–5 as vehicles for suits based on mere corporate mismanagement or breach of fiduciary duty. Such claims are commonly cognizable under state law . . . ."
> (*Id.* at 1130.)

The Court can conclude only that plaintiff has failed to produce any evidence from which a reasonable inference could be drawn that it was a forced seller of its PBA shares. This fact pattern falls within none of the foregoing cases; it is not characterized by the termination of the corporate entity, or by the conversion of a stock ownership into a claim for cash, or by the liquidation and distribution of the assets of PBA.

Apart from the fact that this case does not present a forced sale as described by previous case law, this Court is properly mindful of the proliferation of mismanagement claims which could become cognizable under Rule 10b–5 were the plaintiff's argument herein sustained. If no line was drawn between "wind-downs" and liquidations, conceivably a shareholder could sue under 10b–5 upon a radical change in the nature or complexion of the company's business, or to redress a management decision to sell off a certain part of the firm's business, despite the fact that no purchase or sale of stock was involved. If a firm decid-

ed to retrench drastically by curtailing a large portion of its operations, a plaintiff who had sold no stock could overcome the bar of the *Birnbaum* rule simply by the naked allegation that the termination of the company's existence was imminent and that liquidation was soon to follow. Cf. *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154 (S.D.N.Y.1974).

Accordingly, the Court concludes that the "wind-down" involved no "purchase or sale" of securities and thus that one of the essential elements of plaintiff's third claim under Rule 10b–5 is lacking. Therefore, the motion for partial summary judgment is granted as to that claim.

Defendants' motion for partial summary judgment is granted to the extent indicated above. Decision on the remainder of defendants' motion is reserved.

SO ORDERED.