Michael M. RAND, John Costello, Steven J. Costello, Gregory T. Frese, Edward Lavin, Peter A. Milano, and Vincent F. Servello, Plaintiffs,

v.

ANACONDA–ERICSSON, INC., Ericsson, Inc., L.M. Ericsson Telephone Co., Nordic American Bank, Citibank, N.A., Price-Waterhouse & Co., Sullivan & Cromwell, Richard Howe, Richard G. Lyon, L. Stanton Towne, Telecom Equipment Corp., and Stephen R. Cohen, Defendants.

No. 83 CV 4268 (ERN).

United States District Court,
E.D. New York.

Aug. 30, 1985.
On Motion To Reargue Dec. 2, 1985.

Carl E. Person & Walter C. Reid, New York City, for plaintiffs.

Sullivan & Cromwell, by Robert M. Osgood, Robinson B. Lacy, Maria Foscarinis, New York City, for defendants Anaconda-Ericsson, Inc., Ericsson, Inc., L.M. Ericsson Telephone Co., Sullivan & Cromwell, Richard R. Howe, Richard G. Lyon, and L. Stanton Towne.

Richard G. Lyon, Greenwich, Conn., pro se and as Attorney for defendants Anaconda-Ericsson, Inc., Ericsson, Inc., and L.M. Ericsson Telephone Co.

White & Case by Allan L. Gropper, New York City, for defendant Nordic American Bank.

Howard, Darby & Levin by Philip K. Howard, New York City, for defendant Price Waterhouse.

Shearman & Sterling by William B. Pennell, New York City, for defendant Citibank, N.A.

Paul S. McDonough, Long Island City, N.Y., for defendants Telecom Equipment Corp. and Stephen R. Cohen.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Plaintiffs are seven shareholders of the bankrupt Teltronics Services, Inc. They seek to represent a class of all such shareholders to redress various claims stemming from Teltronics' business relationships with defendant L.M. Ericsson Telephone Co. (Ericsson or Ericsson defendants).

The allegations of the present complaint are familiar to the Court. They involve the same series of events which furnished the basis for the litigation in *Teltronics Services, Inc. and Edward M. Beagan v. Anaconda-Ericsson, Inc., et al.*, 587 F.Supp. 724 (E.D.N.Y.1984), aff'd 762 F.2d 185 (2d Cir.1985), except that no claims are raised on behalf of Edward M. Beagan, Teltronics' founder, former president and substantial stockholder. In brief, plaintiffs claim that through a conspiracy originating with the Ericsson defendants, all of the defendants contributed to a plot to bankrupt Teltronics after the corporation would not succumb to takeover efforts.

According to the present complaint, from which the facts hereinafter related are derived, the friction between Teltronics and Ericsson, a Swedish based manufacturer of telephone equipment, began in 1978 when Teltronics, Ericsson's New York distributor of "interconnect" telephone equipment, opened an office to compete with Ericsson New England, a subsidiary Ericsson distributor. At about this time, one Gerald Tsai, a financier, sought to purchase 20% of Teltronics' stock and thereby represented a substantial source of alternative financing. Teltronics' then current method of financing equipment purchases was through a security agreement in which Ericsson held a secured interest in the revenues generated by the leases of equipment to Teltronics' customers. Defendant Nordic American Bank (Nordic), which is an affiliate of Ericsson, and defendant Citibank supplied the money through notes, which contained an acceleration clause and the payment of which Ericsson guaranteed. The key component or aspect of the security agreement is illustrated in the allegations of ¶ 47 of the complaint, viz.,

> "47. Under the terms of the Loan Agreement, Teltronics was required to purchase a specific dollar amount of Ericsson's telephone equipment. If Teltronics failed to make purchases in the designated amount, Teltronics' loan repayment schedule under the Loan Agreement could be accelerated by Ericsson. Thus, in addition to assigning a security interest in its leases to Ericsson for the loan guarantees under the Loan Agreement, Teltronics was also required to buy telephone equipment from Ericsson in a dollar amount which far exceeded the amount of the loan which Ericsson guaranteed. For example, under the terms of the Loan Agreement with Nordic, Teltronics was required

> > 'during the 12-month period commencing on the date of each Loan hereunder, Borrower (Teltronics) shall purchase from Guarantor (Ericsson USA) telephone switch equipment having an aggregate purchase price of not less than 175% of the amount of such Loan.' "

Plaintiffs add that this arrangement permitted Ericsson to overcharge Teltronics for equipment that was not state of the art.

Concerned about Tsai's offer and the decrease in prices caused by Teltronics' competition in New England, Ericsson expressed interest in acquiring equity in Teltronics. In exchange for Teltronics' foregoing financing opportunities from Tsai, Ericsson agreed to provide debt financing for Teltronics' sales of Ericsson equipment. This offer was made only after Ericsson had insisted that Teltronics withdraw from New England, had refused to furnish vital "support" letters, by which Ericsson would have guaranteed service of the equipment, and had demanded that its loans to Teltronics not be used in the New England operation.

Apparently Ericsson's new business methods were having a sufficient effect that from December 1978 until February 1979 Teltronics and Ericsson discussed Ericsson's purchase of Teltronics stock. Teltronics, however, was opposed to Ericsson's acquiring a controlling interest.

In February 1979 the specter of a catastrophe loomed when Teltronics learned that the "ASB100" a machine intended to replace Ericsson's obsolete line of mechanical equipment, was a failure. As a result, Teltronics proposed a joint venture with Ericsson to develop a new product line, for which Ericsson would furnish a $25 million dollar loan. Alternatively, Teltronics would have to locate a new supplier to serve its substantial client base. Negotiations continued, and at this juncture plaintiffs reason that Ericsson, facing Teltronics' undesirable competition in New England and the possibility that Teltronics would engage a new supplier, thus cutting Ericsson out of the Northeastern United States market, had two choices: purchase Teltronics' shares at market prices or bankrupt the corporation through the security interest in the equipment leases. After choosing the latter option, according to plaintiffs, Ericsson continued to negotiate,

assertedly in bad faith, while it set in motion the events which would secure Teltronics' demise.

In January 1979, by letter to Nordic, Ericsson told the bank that if Teltronics did not make an interest payment of $230,000 due on February 28, 1979, the bank should charge Ericsson's account. During this same period, Ericsson assured Teltronics that as long as negotiations continued, financing would be forthcoming, so much so, that Ericsson agreed to a moratorium of principal and interest payments until March 31, 1979.

The due date of the interest payment also coincided with an exchange between defendant Price-Waterhouse & Co., Ericsson's accountants, and Blonder, Seymour and Shapss, Teltronics' accountants, who represented that they would give Teltronics an "unqualified" or "clean" opinion in the March 31, 1979 10–K filing with the Securities and Exchange Commission (SEC). As the complaint explains, this opinion placed an obstacle in Ericsson's way:

"70. " * * * A 'clean' or 'unqualified' opinion would have resulted in at least a doubling of Teltronics' lines of credit. Indeed Sterling National Bank had already agreed to increase its loan commitment to Teltronics from $1,000,000 to $2,000,000. And it would also have ensured receipt by Teltronics of a $3,000,000 loan committed to Teltronics by Toshiba, a major Japanese trading company, in January 1979.

"71. Price-Waterhouse asked Blonder, Seymour whether they were aware that certain notes and interest payments were coming due for Teltronics, including the interest payment of $230,000 on the Nordic note which, Price-Waterhouse stated was due March 31, 1979. Blonder, Seymour told Price-Waterhouse that it still felt Teltronics would have no difficulty arranging adequate financing 'to meet commitments.'

"72. Price-Waterhouse by its telephone call was attempting to coerce Teltronics' accountants into withdrawing its unqualified opinion. If Price-Water-

house had been successful in intimidating Teltronics' accountants into withdrawing their unqualified opinion, Teltronics' stock would have fallen (a result desired by Ericsson) and any increase in Teltronics' lines of credit would have evaporated."

In response, Ericsson allegedly hatched the fabrication of a non-existent bank default concerning the February 28, 1979 interest payment. This plan had been accelerated from March 31, 1979 in part to prevent Teltronics from publicly announcing that the ASB100 was an incurable failure, and thus an embarrassment to Ericsson's reputation in the industry. On February 28, 1979 defendant Richard Lyon, a member of the defendant law firm of Sullivan & Cromwell, told Nordic not to charge Ericsson's account because Ericsson wanted Teltronics to be in default. The grace period to make the interest payment extended to March 5, 1979, when an attorney for Ericsson telephoned Teltronics to inquire whether the interest payment had been made. Teltronics, of course, had not made the payment and only then realized that Ericsson's prior assurances were no longer reliable.

Efforts to gather the necessary cash proved futile. Plaintiffs claim that because Teltronics had until March 31, 1979 to pay the interest, on the basis of Ericsson's representations, it could easily have sought assistance from other telephone equipment manufacturers that had already offered financing. This time period was unavailable because Nordic had declared a default according to plan. Ericsson paid Nordic $4,945,360.63. In response, Citibank accelerated its loans to Teltronics and on March 7, 1979 received a check from Ericsson for $3,008,632.10. The following press release, disseminated over the Dow Jones Wire Service, announced the event:

"L.M. Ericsson Telecommunications says it filed Teltronics suit.

'NY—DJ—LM Ericsson Telecommunications, Inc. announced that it commenced an action against Teltronics Services, Inc. to recover $4.9 million which Ericsson as

guarantor of Teltronics indebtedness had paid to Nordic American Bank, Inc.

'As part of that action, Ericsson had filed a motion seeking to attach certain Teltronics assets.

'That motion will be heard on March 9th in New York State Supreme Court in Queens County where the action was filed.

'On March 5th Ericsson said it declared Teltronics to be in default under a security agreement between them and today notified certain customers of Teltronics—whose leases are subject to the security agreements—that payment should be made to Ericsson.

'1:43 p.m. E.S.T. March 6, 1979.' "

Complaint ¶ 111.

As a result of these events, Teltronics' stock plunged from $9 per share to $1 a share, causing the SEC to suspend its trading and leaving the corporation unable to find a source of financing. Customers cancelled $6 million in contracts, creditors demanded immediate payment of $2 million, accounts receivable not pledged to Ericsson refused to pay $3 million, and five banks offset $1 million in cash deposits. By September 1979 Ericsson had also persuaded creditors, of which it was the largest, to place Teltronics in involuntary bankruptcy.

Prior to that event, Ericsson had established its New York division on March 6, 1979, which recruited Teltronics' employees and solicited its former accounts. In June Ericsson interfered with Teltronics' attempt to salvage itself through a merger with Stromberg-Carlson, a division of General Dynamics. Teltronics also made a second attempt at revival in August through agreements with defendant Telecom Equipment Corp., of which defendant Cohen is chairman of the board. Teltronics assigned a long term office lease to Telecom in exchange for $50,000, $10,000 per month for 66 months, and a total of 3200 feet of space. Teltronics also became the exclusive sales representative for Telecom on a commission basis, servicing some 500 former accounts. On learning of this arrangement, Ericsson threatened to cut off Telecom's supply of parts needed to repair the equipment used by the aforementioned 500 accounts. Allegedly, Cohen joined the conspiracy when he acceded to Ericsson's demands, as conveyed by the attorneys, and then evicted Teltronics from the building.

In sum, plaintiffs conclude that this was but one example of a pattern Ericsson followed to take over its subsidiary distributors for a modest amount. Allegedly, formerly independent businesses in Florida, Philadelphia, and Boston had been acquired in this manner.

Teltronics' litigation has been catalogued and summarized elsewhere. *Teltronics, supra*, 587 F.Supp. at 727–29; 762 F.2d at 187–88. On this motion for summary judgment, the Court will treat only the claims raised by plaintiffs.

At the outset, plaintiffs assert that defendants violated the Racketeer Influence and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(a), (b), (c), 1964(c). As predicate felonies to support a pattern of racketeering activity, they allege securities fraud, bankruptcy fraud, wire fraud, mail fraud, obstruction of justice, and obstruction of a criminal investigation by the SEC. Complaint ¶ 103.[1]

"There can be little doubt that Fed.R. Civ.P. 9(b), which requires that allegations of fraud specify 'with particularity' the circumstances of the alleged fraud, applies to fraud allegations in civil RICO complaints."

*Haroco v. American Nat. Bank, etc.*, 747 F.2d 384, 405 (7th Cir.1984), *aff'd* — U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam).

"In order to allege mail fraud [or any other fraud], [plaintiffs] must state such matters as the time, place, and contents of the purported false representations. Additionally, [they] must 'specify in what respect each of the statements were false and misleading, and the factual ba-

---

**1.** Paragraph 96 also refers to the collection of unlawful debts; however, there is no allegation that meets the definition of an "unlawful debt" under 18 U.S.C. § 1961(6).

sis for believing that the defendant acted with an intent to defraud.' "

*Doxie v. Ford Motor Credit Co.,* 603 F.Supp. 624, 627 (S.D.Ga.1984) (citation omitted).

Concerning RICO, the complaint alleges,

"99. Defendants, through the use of telephones, wire services and the mails, committed the fraud alleged in the complaint above and related activities of obtaining financial control over Teltronics, declaring a non-existent default, and employing false claims, defenses and testimony in the courts and bankruptcy proceedings against Teltronics and before the Securities and Exchange Commission during its investigation for the purpose of requiring Teltronics, against its will, to turn over its business assets and good will to Ericsson without Ericsson having to pay for Teltronics' stock or assets at their fair market or reasonable value.

"100. Using the telephones, wire services and the mails, defendants (a) issued a fraudulent press release over the Dow Jones Wire Service; (b) solicited, encouraged and assisted some employees of Teltronics to file criminal charges against Teltronics' officers for alleged non-payment of wages; (c) injured Teltronics' reputation with its customers; (d) acquired Teltronics' service contracts; (e) bribed Teltronics' personnel and removed its customer files; (f) prevented Teltronics from meeting its payroll; (g) closed down Teltronics' banking relationships; (h) acquired Teltronics' highly lucrative add-on business; (i) drove Teltronics into bankruptcy to be able to obtain the Teltronics' installed base or whatever was left through the bankruptcy court; (j) took over Teltronics' work in progress which at substantial expense to Teltronics had been substantially completed without corresponding payment to Teltronics and requested the Teltronics' customers to send the balance owed to defendant; and (k) made misrepresentations to Teltronics' customers saying that Teltronics could not service the account (which was false) and that Ericsson as the manufacturer could service the ac-

count, and through the making of such statements took over the servicing of the accounts."

Courts have recognized that

"[t]o meet the Rule 9(b) standard a claimant must identify the circumstances constituting the fraud. This in turn involves identification of the particular defendant with whom the plaintiff dealt; designation of the occasions on which the fraudulent statements were made, and by whom; and designation of what misstatements or half-truths were made and how. (citations omitted). * * * As one court has recently pointed out, a '[p]laintiff is under a Rule 9(b) obligation when dealing with more than one defendant to specify which defendant told which lie under what circumstances.' *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 394 (S.D.N.Y.1983)."

*Saine v. A.I.A., Inc.,* 582 F.Supp. 1299, 1303 (D.Colo.1984).

In respect to the allegations of mail fraud and bankruptcy fraud, the deficiencies about which defendant did exactly what and when are apparent and totally lacking any alternative means of imparting precision or other measure of substantiation. *Compare Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). The allegations of ¶ 100 of the complaint clearly add no specificity. *See Harris Trust, etc. v. Ellis,* 609 F.Supp. 1118, 1123 (N.D.Ill.1985); *see also Hudson v. Larouche,* 579 F.Supp. 623, 629 (S.D.N.Y.1983); *Friedlander v. Nims,* 571 F.Supp. 1188, 1194 (N.D.Ga.1983), *aff'd on other grounds,* 755 F.2d 810, 813 n. 2 (11th Cir.1985). In contrast, other portions of the complaint attribute the authorship of the allegedly deceptive and false press release to the firm of Sullivan & Cromwell.

 The specificity requirement for pleading RICO predicate acts derives not only from Fed.R.Civ.P. 9(b), relating to allegations of fraud, but also from the definition of racketeering activity. Each act list-

ed under 18 U.S.C. § 1961(1)(B) refers to a section of Title 18, which in turn contains the definition of a criminal offense.

"Because a private damage action under RICO may be based on alleged criminal activity from ten years earlier, the factual basis of that activity must be pled with particularity. Otherwise the court is unable to determine whether the acts are 'indictable' and the defendant is unable to prepare its defense."

*Bache, Halsey, etc. v. Tracy Collins Bank,* 558 F.Supp. 1042, 1046 (D.Utah 1983). Nothing in ¶ 99 or anywhere else in the complaint alleges any acts which constitute the obstruction of justice referred to in 18 U.S.C. § 1503 or obstruction of a criminal investigation under 18 U.S.C. § 1510. Essentially, ¶ 99, similar to prior litigation, accuses the defendants of lying under oath to the bankruptcy court and to the SEC. Perjury, however, is not a RICO predicate act.

■ As explained below, the securities fraud claim offers no basis for a RICO predicate act; consequently, there being only one predicate act properly alleged, wire fraud, the RICO claim must be dismissed. *See Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 19 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

The complaint also suffers from an additional flaw. All of defendants' alleged acts were directed at Teltronics; consequently, plaintiffs are shareholders suing to redress injuries inflicted upon their corporation. Drawing an analogy to the antitrust laws, the court in *Warren v. Manufacturers Nat. Bank, etc.,* 759 F.2d 542 (6th Cir. 1985), ruled, in the context of RICO, that " 'diminution in value of the corporate assets [what plaintiffs allege occurred here] is insufficient direct harm to give the shareholder standing to sue in his own right." *Id.* at 544 (citations omitted). In

so ruling, the court observed that this aspect of standing to pursue a RICO claim is unrelated to the type of injury required to support a RICO claim. *Id.* at 545. While the court did not have the benefit of the decision in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), nothing in the Court's interpretation of the RICO statute there addresses the issue at bar. As the court in *Warren* also noted,

"Whether RICO should or should not be interpreted to 'federalize' common law fraud is an issue distinct from whether it should be interpreted to materially expand the standing requirement applicable to such claims. Allowing every shareholder, employee and creditor a cause of action for injuries derivative of those suffered directly by a corporation does not just permit a vast amount of litigation to be brought in federal court that previously could only have been brought in state court, but creates a potential avalanche of suits that previously could not have been brought *at all.*"

759 F.2d at 545 (original emphasis).

Here, Teltronics' bankruptcy trustee litigated, lost, and then settled the corporation's claims against the Ericsson defendants and is pursuing to settlement claims against Telecom. Defendants' alleged activities in furtherance of the asserted conspiracy were directed at Teltronics; consequently, as shareholders, plaintiffs' rights, if any, are only derivative. Were it not for a broad interpretation of 18 U.S.C. § 1964, which this Court declines to adopt because such interpretation would ignore the traditional principle of corporation law that shareholders may not sue for claims their insolvent corporation has settled, most of the instant suit could not have been brought at all.[2]

The state and federal securities claims urged by plaintiffs are identical to the claims Edward Beagan raised in prior liti-

---

**2.** Given the inadequacy of the RICO allegations, the Court need not consider whether this RICO action is time barred by the three year statute of limitations of N.Y.C.P.L.R. § 214 subd. 3. *See* *Durante Bros., etc. v. Flushing Nat. Bank,* 755 F.2d 239, 248–49 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985).

gation. *Teltronics Services, Inc., supra,* 587 F.Supp. at 731–32. Plaintiffs have presented nothing which compels or merits a different result. Accordingly, the Court incorporates its earlier discussion of these claims by reference. *Id.*

Contrary to defendants' argument, and in support of its earlier statement that "in certain circumstances, a bankruptcy liquidation may constitute a sale for purposes of § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1984," 587 F.Supp. at 731, the Court refers defendants to *Alpex Computer Corp. v. Pitney-Bowes, Inc.,* 417 F.Supp. 328, 330–32 (S.D.N.Y.1976) (cases cited and discussed therein). The concept of the "forced seller", which furnishes the basis for the securities claims, is applicable only when a stockholder has been forced by fraudulent means into a situation offering no alternative but to dispose of his stock for cash. *Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 65 (2d Cir.1983). Since a bankruptcy liquidation often results in no cash for the shareholders, it is unlike other "forced seller" situations. *See Landy v. F.D.I.C.,* 486 F.2d 139, 159 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974) (discussion therein). But whatever the merit in plaintiffs' argument that they may proceed despite the absence of a sale of their shares, subsequent case law supports the Court's earlier decision concerning the lack of proximate causation between plaintiffs' allegedly "forced sale" and the defendants' alleged misrepresentations. *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir. 1985); *Bloor v. Carro, Spanbock, etc.,* 754 F.2d 57, 61 (2d Cir.1985).[3]

█ The parties have submitted lengthy affidavits concerning the oral argument of Beagan's appeal (762 F.2d 185) accompanied by a promise to furnish the transcript. Plaintiffs contend and defendants dispute that the panel, and especially Judge Timbers, expressed disagreement with this Court's rulings on plaintiffs' secu-

rities claims in the context of the Beagan case. Assuming *arguendo* that this Court's view of plaintiffs' securities claims is erroneous, neither their remedy nor their strategy for successful persuasion lie in the citation of remarks made by appellate judges during the give and take of oral argument.

█ Plaintiffs also assert a claim pursuant to 15 U.S.C. § 78n(e) (§ 14(e) of the Williams Act), which concerns tender offers. In their memorandum of law at 19 they state,

"The complaint delineates the making of a tender offer for Teltronics' shares by (a) the Tsai interests; (b) the Loral Corporation; (c) Ericsson's formal tender offer prepared by Sullivan & Cromwell; and (d) Ericsson's and Sullivan & Cromwell's widespread solicitation of Teltronics' shareholders after issuance of the Dow Jones press releases by Ericsson, Sullivan & Cromwell and Kleban. Defendants' manipulative and fraudulent conduct was in connection with all of these tender offers."

Kleban was an employee of Teltronics, allegedly fired for issuing an unauthorized press release on March 5, 1979, which confirmed that Teltronics was in default on the interest payment. Whatever the significance of this second press release, the plaintiffs' basis for the § 14(e) claim and, as best as the Court can discern, all of their securities fraud claims, see plaintiffs' memorandum of law at 24–26, is Ericsson's press release. Assertedly, it failed to disclose material facts and constituted a successful manipulative device, because it artificially affected the market in Teltronics' stock and thereby misled investors. See plaintiffs' memorandum of law at 20. The complaint does not allege the existence of any tender offer or actions suggesting a tender offer at the time of the press release, *see S.E.C. v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 950 (9th Cir. 1985); therefore, plaintiffs fail to meet the

---

**3.** In this context the holding of *In Re Investors Funding Corp., etc.,* 523 F.Supp. 533, 544 (S.D.N.Y.1980), upon which this Court relied to dismiss

Beagan's claim pursuant to N.Y.Gen.Bus.Law § 352–c (blue sky statute), has been implicitly approved. *See Bloor, supra,* 754 F.2d at 60 n. 2.

"in connection with any tender offer, etc.," requirement of § 14(e).

Plaintiffs' antitrust claim pursuant to § 1 of the Sherman Act must suffer the same fate as Beagan's similar claim in the prior litigation. The Court incorporates herein its earlier discussion of this matter by reference to 587 F.Supp. at 729–30. In brief, as stockholders, plaintiffs have not established their standing to sue for antitrust claims arising from injuries to Teltronics.

For the foregoing reasons, defendants' motion for summary judgment is granted in its entirety, and the complaint is dismissed. As a result, the Court need not consider plaintiffs' motion to disqualify the firm of Sullivan & Cromwell and its members named as defendants. The Court, however, must consider defendants' request for costs, attorneys fees, and an injunction barring plaintiffs and their counsel from commencing any additional litigation based upon matters alleged in the complaint.

As to the need for an injunction, the same attorneys, who represented Beagan in the prior action brought on his behalf, represent the instant plaintiffs. Despite this Court's injunction, which prohibited Beagan from further litigating claims belonging to Teltronics, these attorneys filed an appeal on Teltronics' behalf without first seeking a stay of that order from this Court. The appeal resulted in the affirmance of this Court's dismissal of Beagan's complaint, including the entering of the injunction, and the affirmance of the Bankruptcy Court's approval of the settlement of Teltronics' claims, which includes the antitrust claim alleged in the complaint. Despite the fact that Beagan was not permitted to litigate claims belonging to Teltronics, plaintiffs' attorneys' continued attempts to relitigate those claims by substituting other Teltronics shareholders must be deemed a flagrant attempt to circumvent the order of the Court of Appeals and the prior rulings of this Court.

At least as to claims not belonging to Teltronics, i.e., securities fraud, plaintiffs'

attorneys were obligated to submit authority which showed that the Court had erred in addressing these same claims as raised by Beagan. Instead, this Court has found that recent cases, not cited by plaintiffs, render their securities fraud contentions more dubious than when they were asserted on behalf of Beagan and rejected. *See National Survival Game v. Skirmish U.S.A., Inc.*, 603 F.Supp. 339, 341–42 (S.D. N.Y.1985).

In short, plaintiffs' attorneys have sought to rehash what has been reviewed twice in the Southern District of New York, twice in the Bankruptcy Court in the Eastern District of New York (the second time resulting in a settlement by the Trustee), and now twice in the Eastern District of New York. In so doing, they have also filed many irrelevant documents related to matters concluded in other courts. *See Limerick v. Greenwald*, 749 F.2d 97, 101 (1st Cir.1984). Given those circumstances, and the fact that this Court's prior decision, 587 F.Supp. 724, and its opinion on reargument should have communicated the frivolity of that suit to any reasonable attorney, plaintiffs' attorneys' opposition to the instant motion for summary judgment, premised upon nothing new, cannot be sanctioned.

As pointed out in *Tedeschi v. Smith Barney, etc.*, 579 F.Supp. 657, 661 (S.D.N.Y. 1984), *aff'd* 757 F.2d 465 (2d Cir.1985) (per curiam) (citations omitted; emphasis added):

"An essential requirement underlying fee shifting, contrary to the general American Rule, is a finding of bad faith on the part of the unsuccessful litigant. An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for the purpose of harassment or delay, or for other improper reasons. The bad faith exception justifying an award of counsel fees and other expenses of litigation extends both to the filing and *the prosecution of the litigation*. The sanction is imposed under the court's inherent equitable pow-

er when the interests of justice so require.

"The assessment of fees for bad faith conduct, when exercised under the court's equitable power, may be imposed upon the errant litigant and his lawyer."

A clear showing of bad faith has been made here. Given the punitive nature of the Court's power to charge an attorney, who acts in bad faith, with costs and fees, the punishment should be limited to the excess costs, expenses, and fees of the prevailing party. *See Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226 (7th Cir. 1984). Cognizant of this standard, the Court finds that its opinion and the Court of Appeals' opinion in the Beagan lawsuit, along with all the other related litigation concerning Teltronics, should have convinced plaintiffs' attorneys of the lack of merit in the instant suit and persuaded them not to oppose the instant motion for summary judgment.

Accordingly, defendants' request for reimbursement for their reasonable attorneys fees and expenses, to be paid by plaintiffs' attorneys, is granted for all such fees and expenses incurred after March 22, 1985, the date the Court of Appeals issued its decision. Additionally, plaintiffs and their attorneys are enjoined from pursuing any new or pending litigation which concerns Teltronics Services, Inc.

SO ORDERED.

## ON MOTION TO REARGUE

The case is again before the Court, this time upon plaintiffs' motion to reargue the Court's decision and order of August 30, 1985, which granted defendants' motion for summary judgment and awarded attorneys fees against plaintiffs' attorneys.

Plaintiffs' attorneys contest the Court's dismissal of their clients' claims. They also challenge the assessment of fees against them personally. Specifically, they ask for a specification of the charges of bad faith/misconduct which support the award of fees and for an opportunity to be heard on this matter at an evidentiary hearing. The Court will first address their contentions concerning asserted errors in dismissing plaintiffs' claims.

Typical of the manner in which plaintiffs' attorneys have pursued this case, in the memorandum of law in support of this motion at 5 they state,

"Although this Court in its opinion (Op. pg. 17) apparently agrees with plaintiffs' argument that the conditions necessary for a "forced sale" exist in this case, it nonetheless argues—for the first time— not that the Ericsson press releases were not 'in connection with' the forced sale of plaintiffs' stock (which was the Court's holding in the *Beagan* case) but that the issuance of the press releases and defendants' subsequent attempts to perpetuate the collapse of plaintiffs' stock were not causally related to the forced sale of that stock. The concepts of 'proximate causation' and the 'in connection with' requirement are distinct and this Court is unclear in its opinion as to whether it has abandoned its earlier reliance on the 'in connection with' requiremnt which it used to dismiss plaintiffs' Rule 10b–5 claim in the *Beagan* case."

On the contrary, proximate causation is an integral aspect of the "in connection with" requirement.

"The precise meaning of 'in connection with' is provided neither by section 10(b) [of the Securities and Exchange Act of 1934] nor rule 10b–5. The case law reveals that in order for this element to be satisfied there must be some causal relationship between the alleged deception and some consequent purchase or sale. Courts have spoken of this connection in terms of reliance and causation."

*Liberty National Insurance Holding Co. v. Charter Co.*, 734 F.2d 545, 555 (11th Cir.1984) (citations omitted); *see Angelastro v. Prudential-Bache Securities Inc.*, 764 F.2d 939, 943 (3d Cir.1985). In recognition of this requirement, speaking of the plaintiffs' claims in *Bennett v. United States Trust Co.*, 770 F.2d 308 (2d Cir. 1985), the Court of Appeals stated,

"They fail to establish the necessary loss causation; there is simply no direct or proximate relationship between the loss and the misrepresentation. *See Bloor v. Carro, Spanbock, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir.1985)."

*Id.* at 314.

In this case the misrepresentation is alleged to be omissions in a press release issued in March 1979. Its relationship to plaintiffs' subsequent "loss", which occurred after Teltronics was ordered liquidated in April 1980, is remote. By analogy, the relationship between the press release and the asserted "forced sale" created through Teltronics' liquidation is similarly remote.

Also contrary to plaintiffs' argument in their memorandum of law, the Court did not conclude that the conditions for a forced sale existed in this case. Unlike the short form merger which occurred in *Vine v. Beneficial Finance Corp.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), where the Court found a forced sale, after the misrepresentation alleged to have occurred here, plaintiffs had neither the right to judicial appraisal of their stock nor the option of selling it pursuant to a preexisting offer, nor any equivalent rights.

Furthermore, the liquidation of Teltronics did not convert plaintiffs' stock into a claim for cash. As the Court noted in *Vine*,

"We do not have here a stockholder who refused to accept a fraudulent offer to purchase his stock but remains a stockholder in an existing corporation; whether to label this hypothetical person a 'seller' under the Rule is a much different question. Due to defendant's acts, Crown has now disappeared and plaintiff's stock has, in effect, been involuntarily converted into a claim for cash."

*Id.* at 634. Here, by contrast, plaintiffs could only exchange their stock for money from the Bankruptcy Court in the event money were available from the Teltronics estate for this purpose. In its prior order the Court merely refused to rule, as defendants had requested, that the liquidation of a corporation in bankruptcy can never result in a forced sale.[1] Further exposition of the concept would be a meaningless academic exercise, injecting dicta into a decision derived from the circumstances of this case. To summarize and reiterate: the Court finds that plaintiffs have not met the "in connection with" requirement of § 10(b) or Rule 10b–5 and plaintiffs have not presented facts which establish a forced sale of their stock.

Having failed to persuade the Court of the viability of their securities fraud claims, plaintiffs' reargument concerning the RICO claim fails.[2] As the Court con-

---

**1.** In the *Beagan* action, the Court observed that, "The fraudulent scheme alleged in the complaint consists of a plot to plunge Teltronics into bankruptcy. [Complaint] ¶ 120. Assuming the success of the plot as alleged in the complaint, the separation of Beagan or any other Teltronics' shareholder from their shares was hardly integral to bankrupting the corporation. Moreover the asserted misrepresentation contained in a press release, was that Teltronics had defaulted on loans from Nordic and Citibank. Although the default may have been excused, or Teltronics may have had a defense to a suit by the banks [or their successors in interest to the debt instruments], it nevertheless defaulted when it failed to make the interest payment on time. Beagan also cites an omission in that the press release failed to state that Teltronics had adequate assets to pay the loans. The availability of money would not preclude a default, and in these circumstances, the asserted

solvency of Teltronics is irrelevant to the fraud alleged to have precipitated its rapid demise. That fraud was defendants' alleged promise to make the interest payments if Teltronics did not do so. Teltronics' possible State law claim for commonlaw fraud arising from this deceit has been settled. The attenuation between this misrepresentation and the securities involved in any subsequent sale, forced or otherwise, is apparent from the pleaded facts." 587 F.Supp. at 731–32. The instant complaint alleges the same facts and merits the same response.

**2.** For reasons which escape the Court (and defy logic), plaintiffs persist in attempting to persuade the Court that *Wilson v. Garcia*, — U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), undercuts the Court's earlier analysis, 587 F.Supp. at 733, and presumably the analysis of *Durante Brothers, etc. v. Flushing Nat. Bank*, 755

cluded earlier, plaintiffs present only one RICO predicate act. Moreover, as previously noted, any injuries to plaintiffs' shares in Teltronics resulted from activities (alleged fraud and antitrust violations) directed at Teltronics. But for plaintiffs' ownership of those shares in that corporation and that corporation's business relationships with Ericsson, plaintiffs would have no loss. As recently pointed out by Judge Edelstein, RICO is not available to shareholders to redress injuries done to their corporation. *Nordberg v. Lord, Day & Lord,* 107 F.R.D. 692, 697, (S.D.N.Y. 1985) (cases cited and discussed therein).[3]

Concerning plaintiffs' claim pursuant to § 14(e) of the Williams Act, the Court stands by its prior ruling that the motion papers disclose no tender offer.

"Although the Williams Act does not define the term 'tender offer', the characteristics of a typical offer are well-recognized. They are described in the House Report of the Committee on Interstate and Foreign Commerce, which held hearings on the proposed Act.

The offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain conditions are met.

H.R.Rep. No. 1711, 90th Congress, 2d Sess., reprinted in [1968] U.S.Code Cong. & Admin.News, pp. 2811, 2811.

"This definition of a conventional tender offer has received general recognition in the courts."

*Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1206 (2d Cir. 1978). The alleged tender offers from Tsai and Loral Corp. never actually material- ized, thus the parties never executed contingent provisions in which Ericsson would have acted as a "White Knight" to prevent the takeover of Teltronics. Ericsson's own negotiations to purchase stock from plaintiffs and Teltronics chief stockholder, Beagan, never contemplated a public solicitation of shares.

In construing § 14(d) of the Williams Act, the disclosure provisions, the Court of Appeals recently stated,

"The borderline between public solicitations and privately negotiated stock purchases is not bright and it is frequently difficult to determine whether transactions falling close to the line or in a type of a 'no man's land' are 'tender offers' or private deals.... [S]ince the purpose of § 14(d) is to protect the ill-informed solicitee, the question of whether a solicitation constitutes a 'tender offer' within the meaning of § 14(d) turns on whether viewing the transaction in the light of the totality of circumstances, there appears to be a likelihood that unless the preacquisition filing strictures of that statute are followed there will be a substantial risk that solicitees will lack information needed to make a carefully considered appraisal of the proposal put before them."

*Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47, 56, 57 (2d Cir.1985). Through five private sales and one open market purchase, Hanson had accumulated 25% of SCM's stock. After stating the above test, the Court advanced seven reasons or factors which illustrated why those transfers were not considered a tender offer.

Six of those factors parallel the instant case as follows: (1) the number of proposed sellers consisted of Edward Beagan and the Teltronics Board of Directors, which collectively held a substantial portion of the corporation's stock; (2) the proposed offer-

F.2d 239, 248–49 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985), concerning the appropriate New York statute of limitations for a civil RICO suit. The RICO claim in this case was dismissed upon deficiencies in the merits and not upon any defense of the statute of limitations.

3. As Teltronics has settled all of its claims against Ericsson as part of a bankruptcy, there is no possibility of a shareholders' derivative RICO suit.

ees knew or should have known about Teltronics financial condition and the security interest which Ericsson held in the equipment leases; (3) any pressure to sell indirectly originated from Ericsson's allegedly illegal activities against Teltronics in the marketplace; (4) there was no active or widespread advance publicity or public solicitation, which is one of the earmarks of a conventional tender offer; (5) the proposed purchase price was never a premium; and (6) Ericsson never proposed a purchase of outstanding shares. *See Beaumont v. American Can Co.*, 621 F.Supp. 484, 499 (S.D.N.Y.1985).

In their memorandum of law at 6, plaintiffs state,

"... [T]he Court's ruling is contrary to the evidence in the record which clearly indicates that Ericsson has sought to acquire the stock of many of Teltronics' shareholders and had taken 'substantial steps', including the preparation of a letter by its attorneys, Sullivan & Cromwell, toward that end."

They do not identify the exhibit which contains this evidence and the Court cannot locate any such letter in the two volumes of documentary exhibits which accompany plaintiffs' original motion papers. From the context, however, the Court comprehends that this letter refers to an offer to buy made by Ericsson after the price of Teltronics stock had fallen. Nevertheless, prior to the default, the evidence discloses that Ericsson's proposal to acquire an equity interest in Teltronics never contemplated a tender offer. Plaintiff's Exh. F, Affidavit of Edward Beagan, ¶¶ 32–34, appendix at 499–500; plaintiff's Exh. Y. As Beagan further explains, negotiations consisting of proposal and counterproposal continued, but no agreement was reached. Beagan Affidavit at ¶ 40, appendix at 502.

▉ Perhaps the most vexatious and ill-founded claim repeatedly advanced by plaintiffs is that they have standing to sue Ericsson for alleged violations of the antitrust laws. Not unsurprisingly, they accuse the Court of having determined the facts in the context of summary judgment. They characterize the Court's finding that Ericsson's alleged activities were directed at Teltronics as "mistaken" because they contend that as shareholders the injury was direct and personal to themselves. Their reliance on *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) is misplaced. As this Court noted in Beagan's action, 587 F.Supp. 729–30, the rules for antitrust standing are stated in the later case of *Associated General Contractors of California v. California Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Rather than undercutting established antitrust law, these rules reinforce the principle that shareholders are not the victims of activities, allegedly violative of the antitrust laws, which are directed at their corporation. Plaintiffs have not identified any activity which was violative of the antitrust laws and directed solely at them.

In a broad sweeping claim, plaintiffs also assert that Ericsson aimed its activities at plaintiffs to collapse the price of their stock. The facts and circumstances do not support such a conclusion. The price of the stock collapsed only after the default. Moreover, plaintiffs' entire theory of a conspiracy to depress the price of Teltronics stock ignores the undisputed facts. Beagan, undoubtedly with consent of Teltronics board members, several of whom are plaintiffs in this suit, gave Ericsson a secured interest in Teltronics assets, the ability to influence the acceleration of a substantial portion of the corporation's debts, and most importantly, the opportunity to profit from an acceleration of that debt. Once Citibank and Nordic American Bank had assigned their rights as holders of Teltronics loans, Teltronics owed the money directly to Ericsson. This situation gave Ericsson the significant interest it had desired in Teltronics, whether Teltronics stock traded for $9 a share or $.09 a share. Undeniably, Ericsson had attained the functional equivalent of an equity position in Teltronics

without ever purchasing a single share; consequently, the Court still fails to understand how depressing the price of Teltronics stock was necessary to the success of the alleged takeover scheme.

Plaintiffs' attorneys' response to the award of fees against them also misperceives the record. They accuse the Court of applying the equivalent of res judicata to bar their clients' claims on the basis of prior litigation. Nothing of the sort occurred. The instant plaintiffs raised the same claims raised by Edward Beagan and neither they nor their attorneys should be surprised that this Court dismissed their claims, in part, in reliance upon its prior exhaustive treatment of these matters. These claims were as meritless when raised by shareholder Beagan as they are when raised by any other Teltronics shareholder.

■ Additionally, nothing in this Court's decision suggests or permits the inference that plaintiffs' attorneys solicited Teltronics shareholders to sue Ericsson after this Court dismissed Beagan's lawsuit. The need or desirability for the multiplicity of actions filed by plaintiffs' attorneys has been attributed by them to unidentified "procedural reasons". Its effect has been to harass Ericsson which prevailed in a trial of many of these same issues in the Bankruptcy Court.

"Under the law in this Circuit, to award fees under the bad faith exception a court must find clear evidence that the losing party's claims were 'entirely without color and made for reasons of harassment or delay or for other improper purposes.' The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice. Under this test, a claim is 'entirely without color' when it lacks any legal or factual basis. While there is no precise definition of 'improper purpose' it may be evidenced by conduct occurring either before or during trial."

*Sierra Club v. U.S. Army Corp. of Engineers,* 776 F.2d 383, 390 (2d Cir.1985) (citations and footnote omitted).

This standard aptly characterizes plaintiffs' attorneys' opposition to Ericsson's motion for summary judgment in this action. Rather than opposing that motion, they should have agreed to the entry of judgment without prejudice to their rights to an appeal; thus saving defendants the costs and fees of preparing additional papers. The Court's sanction is limited and discretely applies only after the Court of Appeals rendered its decision published at 762 F.2d 185.

In considering the effect and sweep of the Court of Appeals' opinion, plaintiffs' attorneys refer to that appeal and the preceding district court litigation as the "Beagan" action or suit. In so doing, they conveniently ignore the remainder of the Court of Appeals' decision and its clear implications for the instant suit. For the reasons stated by this Court, the Court of Appeals affirmed this Court's and the Bankruptcy Court's approval of a settlement by Teltronics' bankruptcy trustee of Teltronics' claims against Ericsson. 762 F.2d at 189. Also for the reasons stated by this Court, the Court of Appeals ruled that Edward Beagan, and obviously his attorneys, had no authority to pursue claims settled by Teltronics' bankruptcy trustee. 762 F.2d at 189–90. Undoubtedly, this Court could not and would not enjoin Beagan from pursuing his own claims, but it did enjoin him from pursuing Teltronics' claims. Nevertheless, his attorneys, here plaintiffs' attorneys, appealed this Court's dismissal of Teltronics without seeking a stay of that injunction.[4] Relying on the same claims and the same allegations, they opposed the instant motion for summary judgment with nothing more than protestations that Ericsson's activities created liability to Teltronics' shareholders, the plaintiffs herein. The Court had already ruled to the contrary, and the subsequent motion

---

**4.** Contrary to plaintiffs' attorneys' assertions, this Court never encouraged them to take an appeal on behalf of Teltronics.

papers and later case authorities have reinforced the correctness of the prior rulings.[5]

■ Significantly, too, plaintiffs' attorneys' manner of opposing the motion also evidences bad faith. They have not explained how or why the problems of an entity referred to as Datasaab, allegedly an Ericsson subsidiary, concerning illegal exports of technology to the Soviet Union relate to Teltronics or the plaintiffs. The documents submitted appear to be intended to disparage Ericsson as a predatory entity allegedly associated with another entity involved in espionage and to convince the Court that individuals allegedly having some connection to Ericsson were less than forthright to a Federal Judge in the District of Columbia. Mudslinging of this genre is inappropriate under Fed.R.Civ.P. 56 and cannot be tolerated. Such a tactic insults the intelligence of the Court because it suggests that irrelevant and prejudicial matters may influence the Court's decisionmaking.[6]

■ Also contrary to their complaints, plaintiffs' attorneys have not been denied procedural due process. Ericsson has repeatedly reiterated its motion for sanctions against plaintiffs' attorneys since the first motion in the Beagan action. *See Wang v. Gordon,* 715 F.2d 1187, 1190–91 (7th Cir. 1983). In the instant case, plaintiffs' attorneys accused Ericsson and its attorneys of bad faith conduct and called for sanctions against them. The court's finding of bad faith rests upon the undisputed activities of plaintiffs' attorneys as evidenced by the events of record. They have had ample

opportunity to address the Court in person and on paper.

Plaintiffs' attorneys appeared at a conference held on the record on September 24, 1985. At that time, they offered no explanation, other than zealous representation of their clients, of why they had opposed Ericsson's motion for summary judgment in light of this Court's prior rulings and the Court of Appeals' decision. Concerning the imposition of sanctions, their memorandum of law submitted in support of the motion to reargue is no more enlightening except to assert that the Court has denied them due process of law in imposing sanctions. Despite these opportunities to explain themselves, they have offered nothing to justify their conduct, which wholly disregards the results of the prior proceedings.

This Court dismissed all of the claims of shareholder Beagan on the merits. Plaintiffs' attorneys have offered no reason why other shareholders (plaintiffs herein) should be treated differently with respect to the same claims.[7] *See Wang v. Gordon, supra;* compare *United States ex rel. United States-Namibia, etc., v. Africa Fund,* 588 F.Supp. 1350, 1352 (S.D.N.Y. 1984); *North American Foreign Trading Corp. v. Zale Corp.,* 83 F.R.D. 293, 298 (S.D.N.Y.1979). They obstinately disagree with that dismissal and the reasons the Court advanced in support of it, insisting, in essence, that the Court does not understand the nature of the case or the law or

5. The prior proceedings concerning Teltronics in this Court and the Court of Appeals put plaintiffs' attorneys on notice that this action was so completely without hope of succeeding that pursuing the matter in this Court, beyond placing the case in an appellate posture, was vexatious to the defendants and indicative of bad faith. *See Glick v. Koenig,* 766 F.2d 265, 270 (7th Cir.1985).

6. Plaintiffs' attorneys submitted their opposition papers (dated July 1, 1985) on July 5, 1985. Apparently, the references to Datasaab were intended to satisfy the RICO requirement of prior criminal convictions, as set out in *Sedima S.P. R.L. v. Imrex, Inc.,* 741 F.2d 482 (2d Cir.1984).

Although this requirement was rejected by the Supreme Court in that case on July 1, 1985, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), in their subsequent papers, plaintiffs' attorneys have not withdrawn their references to exhibits related to Datasaab. The record discloses that Datasaab's activities have no legal or factual impact upon Ericsson's relationship(s) with Teltronics or these plaintiffs.

7. Not only are the claims the same as were raised in the Beagan action, but many of the affidavits and documents submitted by plaintiffs' attorneys are the same, *viz.,* Plaintiffs' Exhs. D, E, F, H, and K (including Exhs. N and O to Exh. K).

asserted liabilities involved. Their remedy lies in an appeal and not in blind pursuit of some hope that the Court will depart from its prior rulings when confronting the same arguments previously rejected and the same authorities previously found either irrelevant or unpersuasive. *See In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.1985) ("[D]ogged pursuit of a colorable claim becomes actionable bad faith once the attorney learns (or should have learned) that the claim is bound to fail.").

In sum, plaintiffs' attorneys have received the notice and opportunity to be heard required prior to the imposition of sanctions, *see Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 708–09 (2d Cir. 1985); *Hasty v. Paccar, Inc.*, 583 F.Supp. 1577, 1580 (E.D.Mo.1984); *see also Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 571 (3d Cir.1985) (en banc), and they have not shown that the sanction is unlawful, clearly erroneous based upon the record, or an abuse of the Court's discretion. *See Sierra Club, supra; United States v. Nesglo, Inc.*, 744 F.2d 887, 891 (1st Cir.1984); *see also Tedeschi v. Smith Barney, etc.*, 579 F.Supp. 657 (S.D.N.Y.1984), *aff'd* 757 F.2d 465 (2d Cir.1985) (per curiam); *Nemeroff v. Abelson*, 94 F.R.D. 136 (S.D.N.Y.1982), *aff'd* 704 F.2d 652 (2d Cir.1983).

Although not raised in their memorandum of law submitted in support of the instant motion, plaintiffs' attorneys, at the aforementioned conference, expressed confusion concerning the breadth of the injunction contained in the order and decision of August 30, 1985. The purpose of that injunction is to prohibit them from commencing any new lawsuits concerning Teltronics, (which the Court considers unlikely) and to prohibit them from further pursuing an action entitled, "Teltronics Services, Inc. and Edward M. Beagan against Telecom Equipment Corp. and Stephen R. Cohen, 83 CV 3740," which they filed in this Court. The injunction does not extend to filing an appeal in this matter and cannot be so misinterpreted.

On the basis of the foregoing, the motion to reconsider is in all respects denied. Ac-cordingly, defendants have 20 days from the date of this order to submit their petition for fees in accord with this Court's order of August 30, 1985. Plaintiffs' attorneys will have 10 days thereafter to submit a response, if any.

SO ORDERED.